05-6623-cv
Amidon v. Student Ass'n of the State Univ. of N.Y.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2006

(Argued: March 23, 2007     Decided: November 20, 2007)

Docket Nos. 05-6623-cv(L), 05-6664-cv(CON), 06-0117-cv(XAP)

----------------------------------------------------------x

ERIC AMIDON, WINSTON BROWNLOW, and COLLEGIAN ACTION LEADERSHIP
LEAGUE OF NEW YORK, by its President,

                    Plaintiffs-Appellees-Cross-Appellants,

        -- v. --

STUDENT ASSOCIATION OF THE STATE UNIVERSITY OF NEW YORK AT
ALBANY, NEW YORK PUBLIC INTEREST RESEARCH GROUP, "NYPIRG," and
PRESIDENT OF THE STUDENT ASSOCIATION OF THE STATE UNIVERSITY OF
NEW YORK AT ALBANY, in his official capacity,

                    Defendants-Appellants-Cross-Appellees.

----------------------------------------------------------x

B e f o r e :  WALKER and B.D.PARKER, Circuit Judges, and CASTEL,
               District Judge.[*]

     Appeal from a judgment of the United States District Court

for the Northern District of New York (David N. Hurd, Judge),

granting summary judgment to the plaintiffs and denying summary

judgment to the defendants on the grounds that the Student

---

[*] The Honorable P. Kevin Castel, United States District Judge for
the Southern District of New York, sitting by designation.

Association of the State University of New York at Albany violated the First Amendment by using an advisory student referendum to determine the amount of funding student associations receive from a pool of mandatory student activity fees.

AFFIRMED.

THOMAS MARCELLE, Law Office of Thomas Marcelle, Albany, New York, for Eric Amidon, Winston Brownlow, and Collegian Action Leadership League of New York.

LEWIS B. OLIVER, Jr., Oliver & Oliver, Albany, New York, for the Student Association of the State University of New York at Albany.

MICHAEL B. DE LEEUW (Alexander R. Sussman, Darcy M. Goddard, Michael F. Savicki, Sloan S.J. Johnston, Alexis Karteron, on the brief), Fried, Frank, Harris, Shriver & Jacobson LLP, New York, New York, for New York Public Interest Research Group.

David C. Vladeck, Georgetown University Law Center, Institute for Public Representation, Washington, D.C., for amicus curiae Connecticut Public Interest Research Group.

JOHN M. WALKER, JR., Circuit Judge:

In this appeal from a November 7, 2005 judgment of the United States District Court for the Northern District of New York (David N. Hurd, Judge), we decide whether the Student Association ("SA") of the State University of New York at Albany

-2-

("SUNY-Albany") violated the First Amendment by using an advisory student referendum to determine how to allocate funds from a mandatory student activity fee among student organizations. The district court held that it did. See Amidon v. Student Ass'n of the State Univ. of N.Y. at Albany, 399 F. Supp. 2d 136 (N.D.N.Y. 2005). For the reasons that follow, we agree.

## BACKGROUND

Every semester, SUNY-Albany collects a mandatory student activity fee of $80 from each student, generating approximately $1.69 million annually. A student who fails to pay this mandatory fee cannot register for classes and has his transcript withheld. N.Y. Comp. Codes R. & Reg. tit. 8, § 302.14(c)(2). Plaintiffs Eric Amidon and Winston Brownlow enrolled at SUNY-Albany in Fall 2001 and have paid the student activity fee each semester.

The SA distributes the funds to recognized student organizations ("RSOs"), of which there are more than one hundred. A regulation issued by SUNY's Board of Trustees requires the SA to make funding allocation decisions in a viewpoint-neutral manner. See id. § 302.14(c)(1)(i).[1] Since August 2003, the SA

---

[1] The collection of mandatory student activity fees is, in the first instance, authorized by the Board of Trustees. See N.Y. Comp. Codes R. & Reg. tit. 8, § 302.14(a). While the Trustees' regulations place some constraints on the manner in which funds may be allocated, the distribution of mandatory fees is largely delegated to student governments. At SUNY-Albany, the SA has adopted provisions in its Constitution and Bylaws establishing procedures for allocating funds. We note that the applicable

Constitution has included (1) a requirement that all SA committees and the SA Senate adhere to the principle of viewpoint neutrality, (2) a definition of viewpoint neutrality, (3) a rule that any SA decision violating viewpoint neutrality is "invalid and null and void," (4) a "standard evaluation form" for submission by RSOs in support of funding requests,[2] (5) requirements of public disclosure upon an RSO's request of any documents relating to a decision denying funding and written statements of the reasons for the denial, and (6) hearing procedures for new and previously unfunded RSOs. SA Const. §§ 808, 809.

RSOs generally must re-apply for funding every year through one of the following methods:

1. **Budget Submission**: The RSO may present a budget to the Student Association, which the SA Senate may adopt, reject, or modify.

2. **Student Referendum**: The RSO may seek funding based upon a campus-wide student referendum in which the RSO asks

---

regulations, the SA Constitution and Bylaws, have been amended during the pendency of this suit. For the purposes of deciding this appeal, we need not discuss the history of those amendments in detail; this opinion addresses only the iteration of the scheme governing the allocation of student fees that was current as of the district court's decision.

[2] A standard evaluation form requires an RSO to disclose its purpose and function, the size of its membership, whether it receives funding from other sources, whether it collects dues from members, whether it collects fees from events, and its proposed budget and expenses to date.

-4-

"whether all students should pay a certain dollar amount" to that organization out of the student activity fund.  To proceed by referendum, the RSO must either obtain a two-thirds vote of the SA Senate or submit a petition signed by at least 15% of the student body.

In September 2004, the Trustees amended the regulation governing student activity fees to mandate that while advisory referenda of the student body were permissible in making funding decisions, such referenda could not be binding on the student government.  See N.Y. Comp. Codes R. & Reg. tit. 8, § 302.14(c)(1)(i).  In March 2005, the SA adopted Bylaws implementing this rule.  Pursuant to the Bylaws, the SA may use referenda only "to advise [it] regarding the appropriate level of funding and not to determine whether a group will or will not be funded."  SA Bylaws § 517.1-.2.  The SA Bylaws set forth a nonexclusive set of criteria, to be discussed later, that determine whether the SA should employ the assistance of an advisory referendum to help calculate a particular level of funding.  SA Bylaw § 517.5.

Two organizations receive what the plaintiffs characterize as "preferential" treatment.  Dippikill, a non-profit corporation that provides an 861-acre property to the school for various activities, is the subject of an advisory referendum at least every four years and most recently received an allocation of

$210,000. The second is New York Public Interest Research Group ("NYPIRG"), an RSO whose "mission is to train students in the skills of civic engagement and advocacy through hands-on experience." It provides numerous services to SUNY-Albany such as nonpartisan voter registration, homelessness awareness and service campaigns, and a book exchange. Although it claims to be nonpartisan, plaintiffs assert that it has a "liberal agenda" and an "ideological bent." Like Dippikill, its funding is re-assessed every four years by an advisory referendum guaranteed to NYPIRG by the SA.[3] In the most recently reported referendum in Spring 2003, the students approved, and the SA Senate allocated, $5 of each student's $80 fee to NYPIRG.

Amidon and Brownlow decided to counter NYPIRG's "liberal agenda" by establishing the "conservative" RSO College Action Leadership League of New York ("CALL-NY"). CALL-NY "focuses on affordable and accessible higher education and environmental problems facing the world" and hopes to solve "consumer and environmental problems" by "unleashing the power of the free enterprise system." In Spring 2003, Amidon presented a bill to the SA Senate requesting a referendum to the student body on whether $5 per student per semester should be allocated to CALL-

---

[3] The parties dispute whether this referendum was advisory prior to the 2004 amendments to the New York regulations that resulted in the current SA bylaws. We agree with the district court that this factual dispute is immaterial to the resolution of this case. Amidon, 399 F. Supp. 2d at 148 n.10.

NY. The SA Senate rejected the bill without adopting any findings. Undaunted, CALL-NY also sought funding for the 2003-04 school year by submitting a proposed budget to the SA, and it was allocated $1,200.

Plaintiffs filed suit against the SA on March 9, 2004, alleging violations of their constitutional rights. The following day, prior to serving the complaint, Amidon once again formally requested that the SA Senate approve a referendum for a $5 per student per semester allocation to CALL-NY. The SA Senate voted unanimously not to place the CALL-NY funding question on a referendum ballot. A CALL-NY representative then served the March 9, 2004 summons and complaint upon the SA Senate president. CALL-NY did not otherwise apply for funding for the 2004-05 school year.

The complaint asserted five claims against the SA under 42 U.S.C. § 1983. Claim I, the focus of this appeal, charged that the use of student referenda to fund and defund RSOs facially violated the First Amendment.[4] Plaintiffs sought, inter alia,

---

[4] Claim II asserted facial and as-applied challenges under the First Amendment to NYPIRG's guaranteed access to student referenda. Claim III alleged that the SA violated the Equal Protection Clause by guaranteeing NYPIRG access to the student referenda while not doing so for other RSOs. Claim IV alleged that the SA violated the Equal Protection Clause by requiring all RSOs except NYPIRG to re-apply for funding every year. Finally, claim V asserted an as-applied challenge under the First Amendment claiming that the SA Senate was impermissibly vested with "unbridled discretion" to determine whether an RSO's funding would be the subject of a student referendum.

In light of its grant of summary judgment to plaintiffs on

-7-

declaratory and injunctive relief, nominal damages of $1 for the violation of their constitutional rights, a refund of $5 per plaintiff per semester of their mandatory student activity fees, and attorney's fees.

Plaintiffs moved for summary judgment. NYPIRG, believing that plaintiffs' primary goal was to defund it, sought, and was granted, permission to intervene. NYPIRG and the SA filed cross-motions for summary judgment.

The district court granted summary judgment to plaintiffs on claim I. Amidon, 399 F. Supp. 2d at 153. The district court held that SUNY-Albany had created a public forum in the form of a fund to support student speech, for which viewpoint neutrality was required. Id. at 147-48. It concluded that the use of advisory referenda was facially viewpoint-based because it necessarily "reflect[ed] the majority view of the value of the RSO on the ballot," did not serve as a proxy for the amount of funding needed, and simply informed the decision makers of public opinion about the group applying for funding. Id. at 150.

NYPIRG and the SA timely appealed, and plaintiffs cross-appealed.

**DISCUSSION**

their first claim, the district court dismissed claims II, III, and V. See Amidon, 399 F. Supp. 2d at 151-52. The district court dismissed claim IV without prejudice because neither party presented sufficient evidence to warrant granting summary judgment. Id. at 153.

We review the district court's grant of summary judgment de novo.  Town of Southold v. Town of East Hampton, 477 F.3d 38, 46 (2d Cir. 2007).  Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  We must construe all the evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor.  LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005).

**I.    Constitutionality of the Use of Advisory Referenda**

We are asked to rule on the constitutionality of the SA's referendum policy in the context of a facial challenge.  In raising a facial challenge, plaintiffs face a "heavy burden."  Nat'l Endowment of the Arts v. Finley, 524 U.S. 569, 580 (1998) (quoting Rust v. Sullivan, 500 U.S. 173, 183 (1991)).  Facial invalidation is "strong medicine," Lopez Torres v. N.Y. State Bd. of Elecs., 462 F.3d 161, 205 (2d Cir. 2006), and is used "sparingly and as a last resort."  Finley, 524 U.S. at 580 (quoting Broderick v. Oklahoma, 413 U.S. 601, 613 (1973)).  To prevail, plaintiffs must "demonstrate a substantial risk" that application of the challenged practice or provision will lead to a First Amendment violation.  See id.

Plaintiffs' challenge to the use of advisory referenda is based upon the jurisprudence of compelled speech.  After

discussing compelled speech doctrine in general, we will turn to its application to mandatory student activity fees.

**A. Viewpoint Neutrality and Student Activity Fees**

The First Amendment's guarantee of freedom of speech includes both the right to speak freely and the right to refrain from speaking at all. Wooley v. Maynard, 430 U.S. 705, 714 (1977); see also Riley v. Nat'l Fed'n of the Blind of N.C., 487 U.S. 781, 796-97 (1988). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943). Consequently, individuals may "hold a point of view different from the majority and . . . refuse to foster . . . an idea they find morally objectionable." Wooley, 430 U.S. at 715.

Because an individual should be allowed to believe as he sees fit without coercion from the state, his First Amendment interests are implicated when the state forces him to contribute to the support of an ideological cause he opposes. See Abood v. Detroit Bd. of Educ., 431 U.S. 209, 234-35 (1977). In articulating this right, the Supreme Court has acknowledged Thomas Jefferson's view that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves[] is sinful and tyrannical." Id. at 234 n.31

-10-

(quoting I. Brant, James Madison: The Nationalist 354 (1948)) (internal quotation marks omitted). Accordingly, the Court has held that teachers' unions and state bar associations, to which members of those professions are required to pay dues, cannot expend objecting members' dues on ideological activities not "germane" to their purposes. See id. at 235-36 (teachers' unions); Keller v. State Bar of Cal., 496 U.S. 1, 13-14 (1990) (state bar associations).

The Court has applied similar principles to restrict the ability of public universities to expend funds that students are required to contribute in the form of activity fees. In Board of Regents of the University of Wisconsin v. Southworth, 529 U.S. 217, 222-23 (2000) [hereinafter Southworth I], the University of Wisconsin supported the activities of RSOs through a fund to which every student was required to contribute. One of the ways the RSO could obtain funding was through binding student referenda on whether the RSO should be funded or defunded. Id. at 224-25, 235. Some students challenged the process as violative of their rights to freedom of expression and association because it forced them to contribute to speech activities with which they disagreed. Id. at 227.

The Court upheld the fee, but, for a number of reasons, declined to apply the "germaneness" standard it used to evaluate the expenditures of teachers' unions and bar associations. Given that a university seeks, as part of its mission, "to stimulate

-11-

the whole universe of speech and ideas," the standard appeared unworkable. Id. at 232. The Court also afforded a degree of deference to the school's judgment, stating that it "is not for the Court to say what is or is not germane to the ideas to be pursued in an institution of higher learning." Id. The Court was also concerned that its disposition could make the university's program "ineffective." Id. As a result, the Court did not require the university to allow "each student to list those causes which he or she will or will not support." Id. The Court instead imposed a less onerous safeguard for objecting students borrowed from its analogous public forum cases: Funds from a mandatory student activity fee to support student speech must be allocated in a viewpoint-neutral way. Id. at 229-30, 233-34.

The Court left undecided whether the use of a binding referendum to fund or defund an RSO violated the First Amendment. Id. at 235-36. In dicta, however, the Court stated:

> It is unclear to us what protection, if any, there is for viewpoint neutrality in this part of the process. To the extent the referendum substitutes majority determinations for viewpoint neutrality it would undermine the constitutional protection the program requires. The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views. Access to a public forum, for instance, does not depend upon majoritarian consent. That principle is controlling here.

Southworth I, 529 U.S. at 235 (emphasis added).

### B. Use of Advisory Referenda

-12-

In this case, we are asked to decide whether, on its face, the SA's advisory student referenda provisions violate Southworth I's requirement of viewpoint neutrality.

As a preliminary matter, we agree with the district court that our decision in Carroll v. Blinken, 957 F.2d 991 (2d Cir. 1992), is not controlling. In that case, students sued SUNY-Albany and NYPIRG because, inter alia, NYPIRG was allocated funds every two years from a pool of student activity fees based upon an advisory student referendum. Id. at 993-94. Although we held that the students' funding of NYPIRG's activities amounted to compelled speech and association, id. at 997, we concluded with scant analysis that use of the referendum was content-neutral. Id. at 999. Importantly, we decided Carroll prior to the Supreme Court's decision in Southworth I – which cast doubt on the use of referenda – and analyzed the funding provision as a regulation of the "non-speech" elements of expressive conduct and a time, place, and manner restriction. See id. at 999 (citing to both classes of cases). Given our lack of full explanation in Carroll and the Supreme Court's intervening decision, we are free to decide anew whether the SA's use of advisory student referenda discriminates based on viewpoint. See Mastrovincenzo v. City of N.Y., 435 F.3d 78, 93 (2d Cir. 2006).

### 1. Allocation Versus Funding

Defendants argue that because the advisory referenda at issue help to determine the amount of funding an RSO receives

rather than whether to fund at all, the referenda do not implicate the First Amendment concerns articulated in Southworth I. Because, given the nature of the public forum at issue, a low level of funding can have the same impact as no funding at all, we find that this factual difference has no constitutional significance.

A pool of student activity fees to fund private speech is a limited public forum in which forum principles apply. Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 830 (1995). There may be restrictions on speech in a limited public forum so long as they are viewpoint-neutral and reasonable in light of the forum's purpose, see Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 143 & n.4 (2d Cir. 2004); see also Bronx Household of Faith v. Bd. of Educ., 331 F.3d 342, 351 (2d Cir. 2003), and do not serve as a facade for viewpoint discrimination, Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 812 (1985). The denial of funding in a viewpoint-discriminatory manner is as impermissible as the denial of access to a physical forum in a viewpoint-discriminatory manner. See Good News Club v. Milford Cent. Sch., 533 U.S. 98, 110 (2001); see also Rosenberger, 515 U.S. at 830-31, 835. This proscription on how funds are allocated is compelled partly by the danger to liberty when the state sets out to classify speech and the risk that protected speech will be chilled when school officials "cast disapproval on particular viewpoints of its students . . . in one

-14-

of the vital centers for the Nation's intellectual life, its college and university campuses."  See Rosenberger, 515 U.S. at 836.

A university's viewpoint-discriminatory decision respecting how much funding to allocate to an RSO raises the same concerns as a viewpoint-discriminatory decision respecting whether to fund an RSO at all.  The level of funding a group receives may serve as an expression of approval or disapproval of the group's message.  And the amount allocated to a group, whether a lot or a little, can skew debate on issues on which the group advocates a position.  In this context, a comparatively low level of funding may not be much different than a complete denial of funding.  A parallel lies in the realm of campaign contributions:

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.  This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.

Buckley v. Valeo, 424 U.S. 1, 19 (1976) (per curiam); see also Fed. Election Comm'n v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 493 (1985).

The defendants argue that RSOs only have "an equal opportunity to be considered for funding," but not a "right to equal funding," and therefore the First Amendment only requires that RSOs have "access" to the fund.  While we do not disagree

-15-

with the defendants' predicates, their conclusion misses the point of Southworth I: A funding decision based on the speaker's viewpoint is impermissible irrespective of whether the harmed RSO had the same right as any other RSO to be "considered" for funding.

### 2. Whether the Referenda Reflect Viewpoints

Viewpoint discrimination is a "subset or particular instance of the more general phenomenon of content discrimination," in which "the government targets not subject matter but particular views taken by speakers on a subject." Rosenberger, 515 U.S. at 829, 831. We have no doubt that the student referendum in this case reflects the student body's majority opinion of the value or popularity of an RSO's speech. Indeed, the SA concedes as much in its brief when it states that "[a]ny RSO may use such an advisory referendum in an effort to demonstrate widespread support among the student body for the services provided by an RSO." SUNY Blue Br. at 36.

It is apparent that any contrary or minority view is at a disadvantage because the referendum simply asks the student body whether an RSO is entitled to a certain amount of funding. For example, according to an affidavit of NYPIRG's executive director, NYPIRG's referendum was used "to gauge whether there is continued support from the student body for the educational programming services and resources provided by NYPIRG." Similarly, the referenda submitted by CALL-NY asked for a set

-16-

amount of funding per student per semester. Viewpoint discrimination arises because the vote reflects an aggregation of the student body's agreement with or valuation of the message an RSO wishes to convey. Cf. Forsyth County v. Nationalist Movement, 505 U.S. 123, 134 (1992) (concluding that a fee for holding an assembly or parade was based on the content of an applicant's speech because an administrator "'must necessarily examine the content of the message that is conveyed,' [and] estimate the response of others to that content" (internal citation omitted)); Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).

We reject the defendants' argument that there is no viewpoint discrimination here because some RSOs simply do not generate any real public interest. Defendants rely on the Supreme Court's decision in Arkansas Educational Television Commission v. Forbes, 523 U.S. 666 (1998). Forbes held that a public television network could exclude an independent congressional candidate who lacked any real public support from a televised debate that included the Democratic and Republican candidates. Id. at 682-83. Although the Court held that the televised debate was a nonpublic forum in which viewpoint discrimination was prohibited, it concluded that the candidate's exclusion was not viewpoint discrimination because he "was excluded not because of his viewpoint but because he had generated no appreciable public interest." Id. at 682.

-17-

Forbes' theory of viewpoint neutrality is distinguishable. The Court explained that when the network excluded Forbes from the debate,

> objective lack of support, not . . . platform, was the criterion. . . . A candidate with unconventional views might well enjoy broad support by virtue of a compelling personality or an exemplary campaign organization. By the same token, a candidate with a traditional platform might enjoy little support due to an inept campaign or any number of other reasons.

523 U.S. at 683. Forbes drew a distinction, perhaps subtle, between a candidate's viewpoint and the degree of interest in hearing the candidate, and concluded, in that context, that one was not necessarily a proxy for the other.

Unlike Forbes, the vote in a student body referendum substantially captures one thing: the student body's valuation of the RSO. While the policy at issue in Forbes may have skewed debate in favor of charismatic candidates or well-run campaigns, the referendum policy creates a substantial risk that funding will be discriminatorily skewed in favor of RSOs with majoritarian views. Favoritism of majority views is not an acceptable principle for allocating resources in a limited public forum. See Rosenberger, 515 U.S. at 835; see also Southworth I, 529 U.S. at 235.

### 3. The Advisory Nature of the Referenda

These viewpoint-discriminatory referenda have no place in the funding allocation process, which requires that "minority

views [be] treated with the same respect as are majority views." Southworth I, 529 U.S. at 235. The SA conceded at oral argument before the district court that the referendum "really serves no purpose in a viewpoint-neutral decision making process." Amidon, 399 F. Supp. 2d at 151. Use of the referendum, on the other hand, can place minority views "at the mercy of the majority." See Sante Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 304 (2000). The SA therefore has no reason to use these purposeless but discriminatory referenda in its allocation decisions. And we think this is true even when the referenda are advisory.

The defendants argue that the First Amendment is offended by the student referenda only when their viewpoint-discriminatory results require a particular funding decision; conversely, they argue, when the referenda are only advisory, the SA is free to disregard the results and maintain viewpoint neutrality. We disagree: While a decision maker is free to disregard a viewpoint-discriminatory, advisory referendum, this practice nevertheless injects a substantial risk of undetectable viewpoint discrimination into the allocation process.

An analogous situation may be found in the constitutional proscription against granting unbridled discretion in the prior restraint context. The Court prohibits unbridled discretion because it allows officials to suppress viewpoints in surreptitious ways that are difficult to detect. See Forsyth County, 505 U.S. at 130-31; see also Thomas v. Chicago Park

-19-

Dist., 534 U.S. 316, 323 (2002).  In order to make decisions granting or denying permits subject to effective judicial review, there must be "adequate standards to guide the official's decision."  Field Day, LLC v. County of Suffolk, 463 F.3d 167, 176 (2d Cir. 2006) (quoting Thomas, 534 U.S. at 323).  While we do not require "perfect clarity and precise guidance," Ward, 491 U.S. at 794; see also Field Day, 463 F.3d at 179, a law subjecting speech to a prior restraint must, as a prophylactic matter, contain "narrow, objective, and definite standards to guide the licensing authority."  Forsyth, 505 U.S. at 131 (quoting Shuttlesworth v. Birmingham, 394 U.S. 147, 150-51 (1969)).

Although the defendants are correct that the Supreme Court has not incorporated the rule against unbridled discretion into the requirement of viewpoint neutrality, the Seventh Circuit's decision in Southworth on remand from the Supreme Court illustrates the appropriateness of such a rule.  See Southworth v. Bd. of Regents of the Univ. of Wis., 307 F.3d 566, 578 (7th Cir. 2002) [hereinafter Southworth II].  In determining whether the plaintiff had standing to mount a facial challenge to the university's program, the Seventh Circuit held that "the prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement."  Id. at 579.  The court engrafted this requirement onto Southworth I's viewpoint-neutrality test because of the risks of viewpoint discrimination

-20-

that attend unbridled discretion and because of the Supreme Court's application of forum principles to student activity funds.  Id. at 578-80.

While there is no need for us to hold that unbridled discretion in general violates Southworth I's call for viewpoint neutrality, the use of these advisory referenda raises concerns similar to those in Southworth II.  A student referendum incorporated into the RSO funding process provides the SA Senate with a window into how the student body has valued an RSO, increasing the risk that it will make a viewpoint-discriminatory decision to appease its electoral constituents.  Because the referendum incorporated in the funding process is only advisory, courts cannot tell the degree to which the referendum infected the SA's decision.

The Supreme Court has suggested that the use of referenda might be constitutional depending upon "what protection . . . there is for viewpoint neutrality."  See Southworth I, 529 U.S. at 235.  But here there are no effective safeguards to prevent a discriminatory advisory referendum from tainting the allocation process.  The defendants point to SA Bylaw § 517.5, which provides the following nonexclusive criteria to determine whether the SA should use a referendum to determine funding:

1.   "[W]hether the organization can demonstrate that it will expend funds for the enrichment of campus life at [SUNY-]Albany"

-21-

2. "[W]hether the organization can provide services that complement the educational mission of [SUNY-]Albany"

3. "[W]hether the organization can demonstrate that it has undertaken successful events and activities in the past"

4. "[W]hether the organization maintains a constitution or bylaws"

5. "[W]hether the organization is directed by students"

6. "[W]hether the organization can demonstrate sufficient student interest in its activities to warrant a particular level of funding"

Just as written criteria alone do not ensure that an official's discretion is adequately "bridled," Beal v. Stern, 184 F.3d 117, 126 n.6 (2d Cir. 1999), the foregoing criteria do not save the use of advisory referenda. First, because the criteria are nonexclusive, there is a disconcerting risk that the SA could camouflage its discriminatory use of the referenda through post-hoc reliance on unspecified criteria. See City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 757-58 (1988). Second, of the enumerated criteria, factors (1) and (2) are too vague and pliable to effectively provide the constitutional protection of viewpoint neutrality required by Southworth I. In sum, we fail to see how viewpoint-discriminatory referenda can be saved by a nonexclusive set of "safeguards," some of which are so indefinite

-22-

as to be meaningless and thus incapable of providing guidance to student decision makers.

The requirement that each RSO complete a standard evaluation form, see SA Bylaw § 513.1, also does not help. While it provides useful information to the SA, the parties point to no standards governing its use.

Finally, the SA Constitution's general requirement that funding decisions be viewpoint-neutral is insufficient to salvage the process. SA Const. § 808. While it is important and useful for the SA to acknowledge the obligations imposed by Southworth I, the bare statement without meaningful protections is inadequate to honor its commands. It does nothing to help courts identify covert viewpoint discrimination, nor does it prevent self-censorship by timid speakers who are worried that officials will discriminate against their unorthodox views notwithstanding constitutional proscriptions. Cf. Southworth II, 307 F.3d at 578-79. We acknowledge that the Seventh Circuit in Southworth II held that the student association was not vested with unbridled discretion because the university had an express policy prohibiting viewpoint discrimination, sanctions for the violation of viewpoint neutrality, and imposed procedural requirements for hearings, see id. at 587-88, all of which are present here. And we do not necessarily disagree with that holding, as far as it goes. But there was no advisory referendum policy at issue in

that case. The question was limited to whether the student association had unbridled discretion to make funding decisions.

The defendants argue that deference is due to the manner in which schools accomplish their educational missions. See, e.g., Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988) (upholding the censorship of a high school newspaper where it was "reasonably related to legitimate pedagogical concerns"); Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 685-86 (1986) (upholding the disciplining of a high school student for a sexually explicit speech at a school assembly). But cases like Hazelwood explicitly reserved the question of whether the "substantial deference" shown to high school administrators was "appropriate with respect to school-sponsored expressive activities at the college or university level," 484 U.S. at 273 n.7, where the relation between students and their schools is "different and at least arguably distinguishable." See Southworth I, 529 U.S. at 238 n.4 (Souter, J., concurring). In Southworth I, the Supreme Court established the appropriate degree of deference owed to universities in implementing funding programs by imposing a requirement of viewpoint neutrality rather than germaneness. See id. at 232-33. We see no reason to grant the SUNY-Albany additional latitude.

The defendants need not be troubled that our views of the matter would prevent a university from allocating its scarce monetary resources unevenly among RSOs. The demand for proceeds

from SUNY-Albany's student activity fund will undoubtedly exceed supply. Southworth v. Bd. of Regents of Univ. of Wis., 376 F.3d 757, 772 (7th Cir. 2004) [hereinafter Southworth III]. While economic scarcity cannot justify viewpoint discrimination in funding student activities, Rosenberger, 515 U.S. at 835, we have no concern with differential funding so long as the allocation decisions are made without regard to the recipients' viewpoints.

SUNY-Albany is therefore free to allocate based upon neutral, objective criteria, see Rosenberger, 515 U.S. at 835; Southworth II, 307 F.3d at 595, that ultimately have a disparate impact on different viewpoints so long as the university's purpose is not to discriminate based on viewpoint. See Boy Scouts of Am. v. Wyman, 335 F.3d 80, 93-94 (2d Cir. 2003). Because an RSO's financial needs do not necessarily reflect its viewpoint, the university does not "impermissibly distort[] [its] marketplace of ideas" by considering those needs. Cf. Davenport v. Wash. Educ. Ass'n, 127 S. Ct. 2372, 2381 (2007). The SA may therefore consider the varying costs RSOs will face in communicating their messages and providing their services, such as the size of space needed or the costs of distributing programs to attendees. See Southworth II, 307 F.3d at 595. If an RSO demands an amount of funding that does not genuinely reflect its costs and needs, the SA is free to provide less. But the university must ensure that the allocation decision is based upon an RSO's objective financial needs.

-25-

Consistent with public forum principles, our decision does not foreclose the use of advisory referenda that are reasonable in light of the forum's purpose and viewpoint neutral. For example, we see no impediment to using an advisory referendum (or, perhaps more aptly labeled, a survey) to ascertain how many students anticipate attending a specific event for which an RSO seeks funding as a means of assessing that RSO's prospective costs. The referendum at issue here, which asks simply whether an RSO should receive a certain amount of funding, plainly crosses the line and fails to provide the protection of viewpoint neutrality the constitution requires.

### 4. The Use of Advisory Referenda Under Strict Scrutiny

Because the use of the advisory referenda at issue here amounts to viewpoint discrimination, to pass constitutional muster this practice must survive strict scrutiny, cf. Boos v. Barry, 485 U.S. 312, 321 (1988), which requires that the policy be narrowly tailored to serve a compelling governmental interest, Hotel Employees, 311 F.3d at 545; see also R.A.V., 505 U.S. at 395; Hobbs v. County of Westchester, 397 F.3d 133, 149 (2d Cir. 2005).

The defendants do not argue that the advisory referenda serve a compelling purpose; rather, they argue that the SA is free to disregard them to the extent they are viewpoint-discriminatory. Nor is there a meaningful claim that they are

-26-

narrowly tailored to any compelling interest.  Consequently, the district court properly granted summary judgment to plaintiffs and denied summary judgment to the SA and NYPIRG.

**II.  Use of Binding Referenda in Allocating Funds to NYPIRG**

Plaintiffs argue on cross-appeal that the SA violated the First Amendment by using a binding referendum to allocate funding to NYPIRG.  We do not reach this issue because plaintiffs were untimely in filing their cross-appeal notice.

A cross-appellant must file within (1) 30 days of entry of judgment or (2) 14 days after the filing of the first notice of another party, whichever is later.  Fed. R. App. P. 4(a)(3); see also In re Johns-Manville Corp., 476 F.3d 118, 120 (2d Cir. 2007).  Judgment was entered on November 7, 2005, and the SA and NYPIRG filed their notices of appeal on December 6, 2005.  Plaintiffs filed their cross-appeal notice on January 5, 2006, beyond the time limit.  Even if it remains an open question whether the non-statutory timing requirement for filing a cross-appeal is jurisdictional after Bowles v. Russell, 127 S. Ct. 2360, 2365-66 (2007) (holding that statutory time limits on filing notices of appeal are jurisdictional), we must strictly enforce the time limit if an adverse party invokes it, In re Johns-Manville Corp., 476 F.3d at 121, 123-24, as the defendants have done here.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is AFFIRMED.