[834 NYS2d 147]

Awards.com et al., Appellants-Respondents, v Kinko's, Inc., et al., Respondents-Appellants, et al., Defendant.

First Department, April 19, 2007

## APPEARANCES OF COUNSEL

*Berg & Androphy*, New York City (*David Berg* and *Gabriel Berg* of counsel), for appellants-respondents.

*O'Melveny & Myers LLP*, New York City (*Andrew J. Frackman, Jonathan Hacker, Michael C. Keats* and *Mark S. Germann* of counsel), for respondents-appellants.

## OPINION OF THE COURT

SULLIVAN, J.

Defendant Kinko's, a Delaware corporation providing office services to businesses and individuals at more than 1,000 service locations throughout the world, and plaintiff Awards.com, a New Jersey company involved in direct and Web site marketing, agreed on a proposal that would allow Awards to launch a new "store-in-store" business selling personalized corporate awards and promotional items within Kinko's locations. On April 30, 2002, after four months of negotiations, Kinko's and plaintiff Inspire Someone, a wholly owned subsidiary of Awards formed for this purpose, entered into a "Strategic Alliance" agreement.

Under the agreement, Kinko's agreed to license the use of its store space to Inspire to sell its products within mutually selected Kinko's locations at a certain monthly rate per square foot. The monthly rate was $150 per square foot through June 2003 and $100 per square foot thereafter, with payment of the previous month's fee due on the 15th of the subsequent month. The agreement did not require Kinko's to invoice the monthly fee each month.

The agreement contained a no-waiver clause in section 10.4, which provided as follows:

> "Amendments; Waivers. This Agreement may not be modified, supplemented or amended except by a written instrument signed by authorized representatives of each Party and referring specifically to this Agreement. Any term, provision or condition of this Agreement may be waived in writing at any time by the Party, which is entitled to the benefit thereof. The failure of either Party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision, nor in any way to affect the right of either Party to enforce each and

every provision of this Agreement thereafter. The express waiver by either Party of any provision, condition or requirement of this Agreement shall not constitute a waiver of any future obligation to comply with such provision, condition or requirement."

Since Inspire was a new business with an untested concept, the agreement provided for an initial "test period," ending if and when Inspire reached certain financial goals. From July to December 2002, Inspire opened seven test store-in-stores at Kinko's locations. In December 2002, Kinko's waived the financial goals requirement and ended the test period early, and on December 31 the parties entered into an amendment to the agreement providing for a nationwide rollout of store-in-stores and for "commercially reasonable efforts [by the parties] to open a minimum of 75 stores by December 31, 2003." Inspire, however, was able to open only 11 additional store-in-stores in the next nine months.

Beginning in March 2003, Inspire's monthly payment, which was approximately $40,000, was untimely and continued so for the remainder of the contractual relationship. The February monthly fee was not paid until May 6. The March and April fees were paid, respectively, more than two and three months after they were due, and as of September 15, the fees for May, June, July and August had not yet been paid.

On September 15, 2003, Kinko's notified Inspire that its monthly payments were in arrears—it owed approximately $160,000 for the May, June, July and August fees. Kinko's also notified Inspire by e-mail of the delinquent amounts. In response, on September 18, 2003, Inspire paid Kinko's approximately $120,000 to cover the fees for May, June and July, but still failed to pay the August fee. As a result, Kinko's terminated the agreement on September 25.

Meanwhile, in November 2002, Kinko's and Awards had met in New York for a preliminary discussion as to whether Kinko's might be interested in investing in or acquiring Awards. Kinko's concluded that such an investment was too speculative and advised Awards that it was not interested. The possibility of a purchase of Awards was discussed at another meeting in January or February 2003 in Dallas, Texas. Kinko's again concluded that it was not interested in investing in Awards at that time.

On June 24, 2003, Aramark Uniform & Career Apparel, Inc. made a proposal to invest up to $9 million in Awards and jointly

to open up to 70 store-in-stores in the first year and up to 100 new store-in-stores each year from 2005 to 2008.* Awards immediately communicated that offer to Kinko's, advising it that a third party had made a proposal to invest in and ultimately acquire Awards. Kinko's response was to conduct another financial analysis of such an acquisition, which yielded a broad range of hypothetical values as to Awards' worth. From late June until mid-July 2003, Awards communicated by telephone and letters with Kinko's about its interest in pursuing a transaction.

In a July 15, 2003 letter, in response to Kinko's expressions of noninterest, Awards proposed that because the parties had a "broad difference of opinion" as to Inspire's value, the proposal under discussion should "be taken off the table." Instead, Awards suggested an approach in which Kinko's could "preserve [its] opportunity to have a greater share in Inspire Someone at some point in the future." On July 21, 2003, Kinko's rejected Awards' suggestions, confirming in writing that "we do not believe that an investment by Kinko's in Inspire at this time (in either equity, debt or other resources) would be mutually beneficial to our companies." As the record shows, Awards did not decline Aramark's offer until after receipt of Kinko's July 21, 2003 letter.

On November 12, 2003, over six weeks after Kinko's had terminated its agreement with Inspire, defendant Federal Express (FedEx) approached Kinko's about acquiring it. Negotiations for the acquisition began and, on December 30, 2003, FedEx announced that an agreement had been reached. The acquisition was completed on February 12, 2004. As the record confirms, FedEx was unaware of Awards' relationship with Kinko's, and, contrary to Awards' contention, had nothing to do with Kinko's termination of its agreement with Inspire.

On October 2, 2003, one week after Kinko's terminated the agreement, Inspire commenced this action, alleging breach of contract and misappropriation of trade secrets. Kinko's answered and counterclaimed for breach of contract. Thereafter, following a motion by Inspire for summary judgment and the denial thereof, Inspire served an amended complaint adding Awards as a plaintiff and six new defendants—Kinko's former majority shareholder and three individuals associated with that

---

* Although, for purposes of this appeal, Kinko's accepts the allegation of such an offer as true, it disputes the bona fides of such an offer.

shareholder (including Kinko's president and chief executive officer [CEO]), and FedEx itself, Kinko's current parent. The amended complaint asserted five new causes of action—fraud, conspiracy to commit fraud, negligent misrepresentation, tortious interference and unjust enrichment. On defendants' motion, the new claims were dismissed with the exception of a portion of the fraud claim, and the newly added party defendants, with the exception of FedEx and Kinko's and its CEO (Kusin), were let out of the case. That left only three causes of action: the first, against Kinko's and its president and CEO, for fraud; the fourth, against Kinko's, for breach of contract; and the seventh, against Kinko's and FedEx, for misappropriation of trade secrets.

After the completion of discovery, defendants moved for summary judgment on the three remaining claims. Supreme Court granted the motion in part, dismissing plaintiffs' fraud and lost profits claims and, finding issues of fact, denied the motion as to the breach of contract and misappropriation of trade secrets claims. The parties cross-appeal from those parts of the disposition adverse to them. The complaint should have been dismissed in its entirety.

■ As regards plaintiffs' appeal, Supreme Court properly disposed of the lost profits claim. To recover such damages in a breach of contract claim, a plaintiff must establish that such damages were actually caused by the breach, that the "particular damages were fairly within the contemplation of the parties to the contract at the time it was made" and that the alleged loss is "capable of proof with reasonable certainty" (*Kenford Co. v County of Erie*, 67 NY2d 257, 261 [1986]; *see also Ashland Mgt. v Janien*, 82 NY2d 395, 404 [1993]). As the motion court correctly found, plaintiffs "fail[ed] to raise a triable issue of fact regarding whether the parties contemplated lost profits at the time of contract negotiation" (2002 NY Slip Op 30025[U], at *21).

The agreement fails to reflect that the parties contemplated lost profits as a potential basis for damages in the event of a breach. Nor, even if admissible, is there any extrinsic evidence that lost profits were within the parties' contemplation (*see Maimis-Knox Group v Grand Cent. Zocalo*, 5 AD3d 129, 130 [2004]). Where a contract is silent on the subject, courts, employing a "commonsense" approach, must determine what the parties intended by considering "the nature, purpose and particular circumstances of the contract known by the parties

. . . as well as 'what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made' " (*Kenford Co. v County of Erie*, 73 NY2d 312, 319 [1989] [citations omitted]). It would be highly speculative and unreasonable to infer an intent to assume the risk of lost profits in what was to be a start-up venture by Inspire. There is nothing to suggest that, in those circumstances, Kinko's would have entered into an agreement to undertake responsibility for lost profits, a liability with unlimited potential. Plaintiffs' claim for $276 million in alleged lost profits, based on sheer speculation, demonstrates the unreasonableness of such an inference. That the evidence suggests Kinko's viewed the Awards relationship as one having value and potential is not to say that the parties contemplated being liable for each other's losses.

*Ashland Mgt.* (*supra*), on which plaintiffs rely, actually undercuts their position. There, the plaintiff sued to prevent the use by the defendant, a former employee, of a mathematical model for determining investment strategy. The defendant interposed a counterclaim and sought lost profits, alleging the parties' agreement on a contract for the use of the model, and the plaintiff's breach thereof. The Court of Appeals found that lost profits damages were foreseeable because "the issue of future earnings was not only contemplated but also fully debated and analyzed by sophisticated business professionals at the time of [the] contract negotiations, projections of the increments to be anticipated over the years were calculated and provisions made for [the defendant's] share of the anticipated profits" (82 NY2d at 405). The Court further noted that the contract itself provided that the nonbreaching party "was to receive 15% of the gross revenues per annum if he left Ashland 'for any reason' " (*id.*), and that the parties "were not entering a new or unfamiliar business" (*id.* at 406). That is not the case here.

Unable to point to any specific evidence of an agreement by Kinko's to pay future profits in the event of a breach, plaintiffs argue that if Kinko's could claim damages for lost profits under section 3.2 (a) of the agreement, then so too could Inspire. That the consideration to be paid by Inspire consisted of a monthly fee, in addition to a portion of future net sales, is not indicative of an agreement to include lost profits as a recoverable measure of damages in the event of a breach by Kinko's. If the parties

had intended to agree to pay lost profits in the event of a breach, they could have so specified just as they had set forth the payment terms due Kinko's. Thus, plaintiffs are attempting to obtain through litigation what they failed to secure at the bargaining table.

Plaintiffs also argue that Kinko's should be liable for lost profits because courts permit them "in the context of a joint venture, partnership, or contract to share revenues." Without conceding the accuracy of that statement, the argument is meritless, as section 10.3 of the agreement specifically provides that Kinko's and Inspire were neither partners nor joint venturers:

> "[U]nder no condition shall the relationship between Kinkos and Inspire established by this Agreement (or contemplated by the Store-in-Store Businesses) constitute, operate or be construed as a partnership (including a limited partnership) or joint venture . . . [and] no Party will be . . . a partner or joint venture of the other Party for any purpose."

Even if plaintiffs could show that the parties had, in fact, at the time of contracting, contemplated liability for lost profits damages, their claim for such damages would still have been properly dismissed because of its purely speculative nature. Since Inspire never made any profits, and could not keep up with its monthly fee payments, there is no profit record to serve as a basis for projecting millions of dollars in future profits (*see e.g. Nineteen N.Y. Props. Ltd. Partnership v 535 5th Operating*, 211 AD2d 411, 412 [1995]). Plaintiffs have not even identified any benchmark in the form of comparable businesses to permit a factfinder to determine that the claimed lost profits are reliable or demonstrated with reasonable certainty. Nor does the expert's report submitted by plaintiffs satisfy the required showing. It is based on nothing but unverified assumptions about future profitability given to him by plaintiffs themselves.

■ Plaintiffs' fraud claim alleges that Kinko's misrepresented that it was interested in purchasing Awards while Kinko's had no such intention. This claim is premised on the proposition that in reliance on Kinko's alleged indications of interest to purchase or invest in Awards, plaintiffs turned down an offer by Aramark to purchase their business. It should be noted that nothing in the April 30, 2002 agreement between Kinko's and Inspire obligated Kinko's to acquire or invest in Inspire or Awards; nor did it give Kinko's the right to do so. It did not

contain a right of first refusal. Indeed, the agreement expressly disclaimed the formation of any partnership or joint venture. It is also a fact that nothing in its agreement with Kinko's precluded Awards, as it understood, from proceeding with a deal with Aramark.

In any event, as the undisputed facts show, plaintiffs did not turn down the Aramark offer until after July 21, 2003, by which date Kinko's had unequivocally advised them, in writing, that it was not interested in either investing in or acquiring Awards. Thus, plaintiffs could not have relied on Kinko's representations (*see e.g. Magu Realty Co. v Spartan Concrete Corp.*, 239 AD2d 469 [1997]); even if, somehow, they had, any such reliance would have been unreasonable (*see Greater N.Y. Mut. Ins. Co. v White Knight Restoration*, 7 AD3d 292, 293 [2004]; *Shea v Hambros PLC*, 244 AD2d 39, 46-47 [1998]). The chief executive officer of Awards, in his deposition testimony, confirmed that Awards' discussions with Aramark about a possible deal continued "through the summer of 2003," well after Kinko's unequivocally expressed its disinterest in investing in or acquiring Inspire.

Turning to defendants' cross appeal, Supreme Court erred in denying summary judgment dismissing plaintiffs' breach of contract claim. Section 3.2 (a) of the agreement required Inspire to pay the monthly fee on the 15th of each month subsequent to the date of execution: "With respect to all periods beginning at the conclusion of the Test Period, the provisions of this Agreement will continue to apply . . . and Inspire will pay Kinkos an annualized amount . . . payable monthly in arrears in pro rata portions on the fifteenth day of the following month." The agreement did not provide a grace period or notice before termination for nonpayment. Nor did it require that the monthly fee be invoiced. As the record shows, Inspire was delinquent in the payment of its monthly fees beginning March 15, 2003, prompting Kinko's, on September 15, 2003, to notify Inspire that it was in breach of the agreement for failure to pay timely the monthly fees for May, June, July and August. When, on September 18, 2003, Inspire paid the other monthly fees that were delinquent, it failed to pay the August fee of approximately $40,000, a breach as to which there can be no dispute.

In the face of this undisputed evidence, Supreme Court denied summary judgment to Kinko's on the ground that an issue of fact existed as to whether Inspire's failure to pay the August monthly fee was a "material" breach, i.e., whether Inspire's

default substantially defeated the parties' contractual objective, particularly where Inspire and its guarantor were ready, willing and able to perform, and where Kinko's "had repeatedly accepted late payments" (2002 NY Slip Op 30025[U], at *16). In so ruling, Supreme Court erred in several respects.

As the court recognized, the monthly fee was the primary consideration under the agreement; indeed, it was the sole consideration for Kinko's. A party's default in payment under similar circumstances is routinely held to constitute a material breach, justifying contract termination (*see e.g. Fifty States Mgt. Corp. v Pioneer Auto Parks,* 46 NY2d 573, 578 [1979] ["covenant to pay rent at a specified time . . . is an essential part of the bargain as it represents the consideration to be received for permitting the tenant to remain in possession of the property of the landlord"]; *Johnson v Phelan,* 281 AD2d 394 [2001] [failure to make annual installment payments constituted a material breach of the contract]; *Hooker v Wooten,* 237 AD2d 572 [1997] [failure to make monthly installment payment constitutes a material breach]; *Daiichi Seihan USA v Infinity USA,* 214 AD2d 487 [1995] [summary judgment warranted where defendant failed to continue to make monthly payments]).

Contrary to the motion court's ruling, Inspire's subjective intention or willingness to perform its obligations is irrelevant; the issue is whether Inspire paid the August monthly fee, not whether it was willing or able to do so. The agreement unambiguously required payment of the monthly fee by the 15th of the following month. In fact, it still has not paid the August monthly fee.

Most significantly though, in finding Kinko's acceptance of late payments relevant to whether Inspire's breach substantially defeated the parties' objective in contracting, Supreme Court made the mistake of conflating two analytically distinct issues— waiver and materiality. While Kinko's acceptance of late payments may be relevant to the issue of whether it waived compliance with the agreement's payment terms, it is irrelevant to the issue of materiality. Were it otherwise, the agreement's no-waiver provision would be rendered superfluous. The party entitled to payment would be at risk of rendering a contract term immaterial whenever, in reliance on the contract's no-waiver clause, it elected to waive prior material breaches. The result would be a waiver based on past conduct, notwithstanding the parties' agreement that such waiver would have no effect on the other party's prospective obligations, thus undermin-

ing the element of certainty in contractual relations. There is no precedential support for the proposition that facts relevant to waiver are relevant to the materiality of a breach.

Quite apart from its conflation of the issues of waiver and materiality, Supreme Court failed to consider the agreement's unambiguous no-waiver clause. Such clauses are uniformly enforced (see e.g. CrossLand Sav. v Loguidice-Chatwal Real Estate Inv. Co., 171 AD2d 457 [1991]; Rodking Serv. Sta. v Gribin, 109 AD2d 873, 874 [1985]).

Relying on easily distinguishable landlord-tenant cases, Supreme Court erroneously held that Kinko's prior acceptance of late monthly fee payments raised an issue of fact as to whether a waiver was effected "precluding it from taking action to obtain timely rent payments in the future" (2002 NY Slip Op 30025[U], at *12). Under the terms of the no-waiver clause, the only effective waiver is one "in writing . . . by the Party, which is entitled to the benefit thereof." Kinko's never waived the 15th of the month deadline in writing.

Moreover, Kinko's and Inspire agreed that any waiver of past defaults "shall not constitute a waiver of any future obligation to comply with such provision, condition or requirement." Thus, to raise an issue of fact as to waiver, it is not sufficient, as Supreme Court held, merely to point to a past election by Kinko's not to terminate by accepting a late payment; otherwise the no-waiver provision would have no effect. Plaintiffs must show that Kinko's knowingly and intentionally agreed to waive the future payments due date; they have presented no evidence of such waiver, other than Kinko's acceptance of prior late payments.

Furthermore, Supreme Court's reliance on Kinko's acceptance of past late payments confuses the election of remedy with waiver (see Bigda v Fischbach Corp., 898 F Supp 1004, 1013 [SD NY 1995], affd 101 F3d 108 [2d Cir 1996]). When a party materially breaches a contract, the nonbreaching party must choose between two remedies: it can elect to terminate the contract or continue it. If it chooses the latter course, it loses its right to terminate the contract because of the default (id. at 1011; Emigrant Indus. Sav. Bank v Willow Bldrs., 290 NY 133, 144 [1943]), but given the no-waiver clause, it retains the option of terminating the contract for subsequent breaches (Bigda, 898 F Supp at 1011-1012). Thus, even if Kinko's waived its remedy of terminating the agreement based on Inspire's late payments by accepting them, it retained its right to terminate

for Inspire's failure to make timely payments in the future. Supreme Court confused Kinko's election of remedies with respect to Inspire's past breaches with the question of whether it waived the agreement's payment provision as to future payments, thereby effectively modifying the agreement.

■ Plaintiffs' cause of action for misappropriation of trade secrets seeks only injunctive relief, not nominal damages, as they now argue. This cause of action is based on Kinko's alleged violation of the parties' nondisclosure agreement by publicly filing the Kinko's PowerPoint analysis in the appendix. Assuming, arguendo, that the analysis contained any trade secret material, plaintiffs waived any trade secret protection by publicly filing the document with the record both in Supreme Court in August 2005 in connection with their opposition to defendants' motion, and again in this Court in the Joint Record on Appeal. Protection against the misappropriation of trade secrets still requires a substantial element of secrecy (*see Ashland Mgt.*, 82 NY2d at 407; *Atmospherics, Ltd. v Hansen*, 269 AD2d 343 [2000]).

Accordingly, the order of the Supreme Court, New York County (Charles Edward Ramos, J.), entered January 26, 2006, which granted defendants' motion for summary judgment to the extent of dismissing the claims of fraud and lost profits damages, should be modified, on the law, the complaint dismissed in its entirety, and otherwise affirmed, with costs and disbursements to defendants. The Clerk is directed to enter judgment accordingly.

TOM, J.P., FRIEDMAN, CATTERSON and MALONE, JJ., concur.

Order, Supreme Court, New York County, entered January 26, 2006, modified, on the law, the complaint dismissed in its entirety, and otherwise affirmed, with costs and disbursements to defendants. The Clerk is directed to enter judgment accordingly.