**EXPORTACIONES DEL FUTURO S.A. DE C.V., Plaintiff,**

v.

**ICONIX BRAND GROUP INC. and IP Holdings Inc., Defendants.**

**No. 07 Civ. 4145(LBS).**

United States District Court, S.D. New York.

April 27, 2009.

Jared Bennett Stamell, John Christopher Crow, Stamell & Schaffer, LLP, New York, NY, for Plaintiff.

Debra A. Karlstein, Spears & Imes, L.L.P., New York, NY, for Defendants.

### MEMORANDUM & ORDER

SAND, District Judge.

The underlying facts of this suit stem from a negotiation over a contract to license the "Mudd" trademark to manufacture clothing in Mexico. The parties have presented the Court with two competing factual contexts for this case. Plaintiff Exportaciones del Futuro asserts that it entered into a contract with Defendants Iconix Brand Group and IP Holdings but was eventually excluded from the transaction when Defendants realized that they could profit more by bypassing Plaintiff and dealing directly with the manufacturer to whom they had been introduced by Plaintiff. In contrast, Defendants assert that Plaintiff misled them about its true identity, and when they finally discovered that Plaintiff was not the company with whom they thought they were negotiating, they ended negotiations with Plaintiff and pursued an agreement with the company with whom they thought they had been dealing the entire time.

Plaintiff has brought claims for breach of contract, tortious interference with contract, injurious falsehood, and quantum meruit. Before this Court is Defendants' motion for summary judgment on all of Plaintiff's claims and Plaintiff's cross-motion for partial summary judgment on its breach of contract claim. For the reasons set forth below, Plaintiff's and Defendants' motions for summary judgment on the breach of contract claim are denied. Defendants' motions for summary judgment on Plaintiff's tortious interference and quantum meruit claims are also denied. However, Defendants' motion for summary judgment on Plaintiff's injurious falsehood claim is granted.

### I. Facts

In early 2006, Plaintiff, through its principal Joseph Gershon, approached Iconix seeking an exclusive license to manufacture and distribute clothing bearing the Mudd brand owned by Defendants in Mexico. In summer 2006, Gail Tentler, head of international licensing for Iconix, traveled to Mexico with Gershon to see where the apparel would be manufactured. Gershon

brought Tentler to Future Export's clothing factory. Future Export is an entirely distinct corporate entity from Exportaciones del Futuro. Gershon told Tentler that Future Export was the company who would actually be manufacturing of the apparel. Tentler was impressed with the Future Export factory and thus recommended that Iconix enter into a licensing agreement with Gershon's company.[1]

After Tentler's visit, Plaintiff and Defendants began to negotiate the terms of a written licensing agreement. On September 20, 2006, Iconix's General Counsel forwarded Gershon an "Execution Copy" of a licensing agreement ("Licensing Agreement"). The Licensing Agreement was attached to an email stating the following: "Please have 2 copies signed and returned to me. We will then arrange for signature on our end and return a fully-signed copy to you." (Email of Andrew Tarshis, Sept. 20, 2006, Ex. M Karlstein Decl.) On or about October 3, Gershon signed a copy of the Licensing Agreement and returned it to Defendants. At some point between Tentler's return from Mexico in summer 2006 and October 3, 2006, when Plaintiff signed the contract, Plaintiff's relationship with Future Export deteriorated such that Plaintiff no longer planned on using Future Export to manufacture the Mudd apparel. (Dep. Joseph Gershon, at 38–39.)

After receiving a signed contract from Plaintiff, Defendants signed the Licensing Agreement but did not return a signed copy to Plaintiff. It is disputed, however, when the Licensing Agreement was signed by Defendants. Plaintiff notes that the evidence suggests it was signed prior to October 9, the date on which Iconix issued a press release announcing the Licensing Agreement to the public. Defendants argue that it was signed after October 11

because of an internal email on that date expressly stating that the contract was not fully executed by Defendants. (Email of Marianna Fundator, Oct. 11, 2006, Ex. S Karlstein Decl.)

On or about October 17, Tentler asked Gershon to provide Iconix with a company profile and to identify the factories that would be manufacturing Mudd apparel. On October 18, Gershon emailed Tentler a company profile. (Email of Joseph Gershon, Oct. 18, 2006, Ex. O Karlstein Decl.) On October 19, Tentler emailed Iconix's General Counsel, among others, stating that she had not yet received the company profile from Gershon and stating that she intended not to take Gershon's phone calls until an agreement was signed with a "more reliable partner." (Email of Gail Tentler, Oct. 19, 2006, Ex. L Bowles Decl.) On October 19, 2006, Gershon emailed Iconix's General Counsel informing him that Gershon had begun to meet with retailers concerning distribution of Mudd apparel. The email also expressed confusion concerning Plaintiff's relationship with Iconix, based on Iconix's allegedly hostile and nonresponsive conduct toward Plaintiff. (Email of Joseph Gershon, Oct. 19, 2006, Ex. H Bowles Decl.)

Sometime in or about the last week of October 2006, Tentler informed Gershon that Defendants did not feel comfortable going forward with the Licensing Agreement with Plaintiff. (Gershon Dep., at 190.) On November 1, 2006, Defendants signed a licensing agreement with Future Export. On November 3, 2006, Defendants repudiated Plaintiff's Licensing Agreement in writing. (Email of Andrew Tarshis, Nov. 3, 2006, Ex. G Bowles Decl.)

There are numerous facts about which the parties differ in this case. Defendants

---

1. As discussed below, the parties dispute whether Tentler thought Defendants were entering into an agreement with Future Export or whether she knew that Defendants were entering an agreement with Exportaciones del Futuro.

assert that Gershon misled them by passing Plaintiff off as a reputable company, Future Export, when in fact it was a distinct and unproven company, Exportaciones del Futuro.[2] Defendants allege that Plaintiff was trying to benefit from confusion by naming his company the Spanish name Exportaciones del Futuro, which could be easily confused with the English name Future Export. As proof that Plaintiff was trying to create confusion, Defendants point to several instances in which Plaintiff claimed to be representing Future Export. (E.g., Email of Joseph Gershon, July 20, 2006, Ex. G Karlstein Decl.) Defendants allege that Gershon signed his emails as "Joe Gershon, FUTURE EXPORT S.A. DE CV." (E.g., Email of Joseph Gershon, July 26, 2006, Ex. H Karlstein Decl.) They additionally allege that Plaintiff's lawyer represented to Iconix's General Counsel that he was representing Future Export. (E.g., Email of Jeffery Dweck, Aug. 17, 2006, Ex. J Karlstein Decl.) Defendants claim that this misunderstanding was furthered when Gershon took Tentler to Future Export's factory and assured her that Future Export would be manufacturing the apparel. Finally, Defendants claim that the truth that Exportaciones del Futuro is a distinct entity from Future Export was only revealed after a rift between Plaintiff and Future Export occurred, at which time Defendants started to pursue an agreement with Future Export, with whom they thought they had been dealing the entire time.

Gershon denies the allegation that he misled Defendants and rejects the assertion that Defendants were confused about Plaintiff's identity. Gershon claims that he was planning on entering into a partnership or sublicensing arrangement with Future Export wherein Future Export would manufacture the apparel and Plaintiff would distribute the apparel. (Gershon Dep., at 37–38.) Gershon asserts that this relationship with Future Export explains why he signed the emails with the name Future Export and why he took Tentler to see Future Export's factory. (Gershon Dep., at 47.) Gershon acknowledges that he had a distinct company named Exportaciones del Futuro, S.A de C.V., but asserts that he expressly discussed the planned relationship between Exportaciones and Future Export such that Tentler knew that Gershon was not acting on behalf of Future Export. (E.g., Gershon Dep., at 141, 103–104.) Plaintiff views the context of this case very differently; it alleges that at the end of the negotiations Defendants realized that they could profit by excluding Plaintiff and contracting directly with Future Export and that this financial motivation, and not Defendants' alleged confusion about Plaintiff's identity, prompted Defendants' change of heart after the Licensing Agreement was signed.

Defendants additionally assert that Gershon attempted to mislead them by submitting a company-profile that bore the name Exportaciones del Futuro but that was actually prepared for a different business, Superjeans. Defendants assert that Plaintiff simply changed the company name on the existing Superjeans profile and attempted to pass off the corporate information of Superjeans as its own. (Gershon Dep., at 152–157.) Gershon does not contest that he did submit such a profile, however, Gershon claims that Tentler knew that he was handing her a profile with incorrect information. Gershon essentially claims that he did so at the instruction of Tentler, who allegedly told him that the company profile request was merely a formal requirement that

---

**2.** Plaintiff alleges, for example, that the corporation named Exportaciones del Futuro S.A. de C.V. was not even incorporated until September 11, 2006.

need not be taken seriously. (Gershon Dep., at 152–153.)

Plaintiff also makes certain other contested allegations. Specifically, Plaintiff alleges that Defendants told third parties that Plaintiff did not have a licensing agreement with Defendants to use the Mudd trademark and that Plaintiff was not a trustworthy business partner. (E.g., Gershon Dep., at 233–34.) Plaintiff alleges that as a result of these statements these third parties now refuse to do business with Plaintiff. (E.g., Gershon Dep., at 234–36.) Defendants reject these assertions and point out that the only evidence Plaintiff uses to substantiate these claims are Gershon's secondhand accounts of what Defendants said to third parties. Defendants stress that Gershon never claims to have been present when any of the alleged statements were made and that Plaintiff has no evidence that these statements were made from any party to the alleged conversations.

Plaintiff also alleges that Gershon began to establish the profitability of the license and relationships with manufacturers and retail distributors prior to Defendants breach of the Licensing Agreement. (Gershon Dep., at 175–177.) Gershon alleges that Defendants had informed him that they signed the contract (even if they had not delivered it yet) and that Defendants gave him the "green light" to start performance on the contract. (Gershon Dep., at 176, 218.) Among other agreements, Plaintiff alleges that he had negotiated a three million dollar guarantee with two retailers willing to sell Mudd apparel for one year. (Gershon Dep., at 166–167, 249–250.) Plaintiff alleges that as a result of Defendants' repudiation of the Licensing Agreement, manufacturing and distribution agreements that Plaintiff was negotiating were halted and parties with whom Plaintiff was negotiating on behalf of the Mudd brand have since refused to do busi-

ness with Plaintiff. (E.g., Gershon Dep., at 166–167, 223, 227–229, 231–232.) Defendants deny that Tentler asked Gershon to take these steps in accordance with the Licensing Agreement. Defendants assert that Plaintiff's alleged actions were taken only in the hope and anticipation of obtaining the Licensing Agreement and not as performance on the contract.

**II. Standard**

Summary judgment is appropriate when "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). "A fact is material when it might affect the outcome of the suit under governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could have returned a verdict for the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir.2007). When ruling upon cross-motions for summary judgment, the court must evaluate each motion separately and must draw all reasonable inferences against the party whose motion is under consideration. *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 88 (2d Cir.2003).

**III. Analysis**

1. *Defendants' Motion for Summary Judgment on Breach of Contract Claim*

A review of the record reveals genuine issues of material fact as to whether Defendants breached a contract with Plaintiff. Plaintiff asserts that the contract was entered into and breached when Defendants signed a licensing agreement with Future Export to manufacture and distribute Mudd apparel in Mexico. Defendants do not contest that if it were bound by the Licensing Agreement it would have no right to enter into such an arrangement with Future Export. Defendants instead move for summary judgment arguing that they were never bound by the Licensing Agreement.

Section 6.2 of the Licensing Agreement requires Plaintiff to pay a royalty payment of "$50,000 simultaneously with the execution hereof; and $24,500 on each of May 1, 2007 and August 1, 2007." It is undisputed that Plaintiff did not make these payments to Defendants. Defendants argue that the failure to make the initial royalty payment prohibits Plaintiff from enforcing the contract for three reasons: (1) without the royalty payment a contract was never formed; (2) Plaintiff breached the contract when it failed to pay the royalty; (3) Plaintiff did not substantially perform its obligations under the contract by failing to make the payment. Defendants further argue that no contract was formed between Plaintiff and Defendants because a signed contract was never delivered to Plaintiff from Defendants. The Court finds that summary judgment is inappropriate in this case because there are disputed issues of fact related to the effect of Plaintiff's failure to pay the $50,000 royalty payment. Moreover, summary judgment is denied because there are genuine issues of material fact regarding whether the parties intended for the contract to be enforceable upon signature or delivery.

Defendants first argue that they had no obligations under the Licensing Agreement because Plaintiff's failure to make the $50,000 royalty payment either resulted in the Licensing Agreement never becoming effective or constituted a breach of that contract. While material breach of a contract by one party does indeed release the other from any duty to perform, *see Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 834 N.Y.S.2d 147 (1st Dep't 2007), it is disputed whether a breach of contract occurred in this case. Section 16.1(a)(ii) of the Licensing Agreement states that "[i]f Licensee fails to make any payment due hereunder ... if such default shall continue uncured for a period of ten

(10) business days after notice thereof for the Licensor, Licensor may terminate this Agreement forthwith by notice to Licensee." It is undisputed that Defendants did not provide notice of default to Plaintiff per § 16.1(a)(ii). Accordingly, Plaintiff argues that it could not have been in breach of the Licensing Agreement until it had an opportunity to cure its failure to pay the royalty payment.

Defendants second argue that they did not provide such notice because the contract was never formed and that they believed that no contract had formed because the initial payment was not made. Defendants assert the payment of the $50,000 was a necessary precondition of contract formation. Plaintiff responds that, although the $50,000 payment was to be made "simultaneously" with execution of the contract, no language in the contact makes that payment a precondition to execution. Plaintiff asserts that any issues with respect to the nonpayment of the $50,000 is governed by § 16.1(a)(ii) as it was merely a payment under the contract. The Court finds both of these interpretations of the contract to be plausible. Because there is a genuine issue of fact as to whether § 16.1(a)(ii) applies to the initial $50,000 royalty payment, summary judgment is not appropriate as to the breach of contract question.

■ Defendants further argue that the Licensing Agreement is unenforceable by Plaintiff because Plaintiff failed to substantially perform under the contract when it failed to make the $50,000 royalty payment. Nonperformance can be fatal to a breach of contract action. *See First Frontier Pro Rodeo Circuit Finals LLC v. PRCA First Frontier Circuit*, 291 A.D.2d 645, 737 N.Y.S.2d 694, 694 (3d Dep't 2002). However, failure to perform is not necessarily fatal where a defendant's conduct was an impediment to performance and where Plaintiff was otherwise ready, will-

ing, and able to perform. *See BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 697–98 (2d Cir.1993). Plaintiff argues that its nonperformance was the direct result of Gershon's inability to communicate with Tentler and others at Iconix, who were intentionally avoiding him after they received his signed contract. Plaintiff asserts that it was willing and able to make such a payment had Iconix moved forward with Exportaciones as opposed to working toward a deal with Future Export after it had announced and signed the Licensing Agreement with Exportaciones. (Tr. Oral Arg., Apr. 2, 2009), at 12; (Gershon Dep., at 163–164) Reading the facts in a light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that Plaintiff's nonperformance was only a result of Defendants' actions after Plaintiff signed the Licensing Agreement.

■ Defendants finally argue that no contract existed because Defendants never delivered the Licensing Agreement to Plaintiff. Plaintiff responds by noting that the contract does not mention delivery as a requisite of contract formation. Plaintiff further argues that the Court must reject any argument by Defendants that the parties previously agreed that the contract would be enforceable upon delivery because the Licensing Agreement contains an integration clause.[3] Under New York law, for most written agreements, the intent of the parties determines whether a contract is enforceable upon execution or delivery. *Intercontinental Monetary Corp. v. Performance Guarantees, Inc.*, 705 F.Supp. 144, 149 (S.D.N.Y.1989). Where a contract is fully integrated, its terms may not generally be varied by parol evidence. However, where the parol evidence sought to be introduced does not contradict an express term of a contract, the rule does not apply. *Krofft Entm't, Inc. v. CBS Songs, A Division of CBS,*

*Inc.*, 653 F.Supp. 1530, 1533 (S.D.N.Y. 1987).

The Licensing Agreement does not address whether the contract is enforceable upon execution or delivery. Although the contract does state that it is executed upon signature, as Plaintiff notes, it is not clear whether the contract is enforceable upon execution or delivery. *See Intercontinental Monetary*, 705 F.Supp. at 148 (holding that language on execution does not speak to enforceability). Plaintiff argues that the absence of language on enforceability should resolve the issue. However, courts that have dealt with this issue have consistently looked to the intent of the parties when a contract has been silent on the issue of delivery. *Id.; Rail Europe Inc. v. Rail Pass Express, Inc.*, No. 94–CV–1506, 1996 WL 157503, at *5 n. 5 (S.D.N.Y. Apr. 3, 1996); *Krofft*, 653 F.Supp. at 1533. Courts have found that the silence of an integrated agreement regarding enforceability permits the court to consider parol evidence, so long as that evidence does not contradict any term in the integrated agreement. *Hicks v. Bush*, 10 N.Y.2d 488, 491, 225 N.Y.S.2d 34, 180 N.E.2d 425 (1962).

Defendants argue that their actions evince an intent not to be bound by the contract until delivery. Absence of delivery, they argue, is itself evidence that the process of contract formation was not complete, especially where the parties sign the instrument out of the presence of each other and then withhold delivery of the signed document. *Intercontinental Monetary*, 705 F.Supp. at 149. Defendants contend that non-delivery of a signed contract is particularly relevant in the corporate setting where companies, such as Defendants, have specific policies in place to sign and hold contracts while deciding whether to proceed with the agreement at issue. (Tarshis Dep., at 46.)

---

**3.** Paragraph 22.5 of the Licensing Agreement.

Defendants further argue that their intent to make the contract enforceable upon delivery is clear from the email of Iconix's General Counsel on September 20, 2006. That email stated that upon receipt of a signed contract from Plaintiff, Defendants would "arrange for signature on our end and return a fully-signed copy to you." (Email of Andrew Tarshis, Sept. 20, 2006, Ex. M Karlstein Decl.) Whether forwarding the copy without payment of the $50,000, which was to be made simultaneously with execution of the contract, would have constituted a valid delivery would also depend upon the intent of the parties.

Plaintiff argues that Defendants' actions upon receiving the signed contract from Plaintiff strongly suggest that the parties intended to be bound by the agreement regardless of the fact that the signed agreement was not delivered. Plaintiff argues that the press release issued by Iconix on October 9, 2006 announcing that it had entered into an exclusive multi-year license agreement with Exportaciones is strong evidence that Iconix considered itself as having entered into an agreement prior to delivery of the signed contract. Plaintiff further points to Gershon's testimony that representatives of Iconix informed him that Defendants had signed the contract and authorized Gershon to make deals with distributers based on the fact that there was a completed deal between the parties. (Gershon Dep., at 175–177, 218.) Reading the facts in a light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that the parties intended for the Licensing Agreement to be enforceable upon signature and not upon delivery or payment of the $50,000.

As the Court has found numerous disputed issues of material fact relating to the breach of contract claim, Defendants' motion for summary judgment on this claim is denied. It follows from the numerous factual disputes outlined above that summary judgment with regards to Plaintiff's motion is also inappropriate and therefore is denied.

### 2. Defendants' Motion for Summary Judgment on Tortious Interference Claim

 Plaintiff brings a second claim alleging that Iconix caused IP Holdings to breach and repudiate the Licensing Agreement with Plaintiff. A plaintiff can establish tortious interference with contractual relations if it can show the following: "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages." *Hirsch v. Food Res., Inc.*, 24 A.D.3d 293, 808 N.Y.S.2d 618 (1st Dep't 2005). If a party has an economic interest in a contract, however, then that party is privileged to interfere with a contract if his purpose is to protect his own interest and if he does not employ improper means. *Foster v. Churchill*, 87 N.Y.2d 744, 750–51, 642 N.Y.S.2d 583, 665 N.E.2d 153 (1996). It is undisputed that Iconix had an economic interest in an allegedly valid Licensing Agreement because IP Holdings was a wholly-owned subsidiary of Iconix. Under New York law, "[t]he imposition of liability in spite of defense of economic interest requires a showing of either malice on the one hand, or fraudulent or illegal means on the other." *Id.*

The viability of Iconix's motion turns on whether Plaintiff can establish whether Iconix acted with the requisite intent in this case.[4] Iconix argues that it caused

---

**4.** The parties do not dispute the second and fourth elements of this cause of action: that

the breach to protect its own financial interest by thwarting a deal with a party who was purporting to be a corporation that it was not. Plaintiff views Defendants' actions through a different lens. Plaintiff argues that Iconix procured the breach because Iconix concluded that it could make more profit by cutting Plaintiff out of the arrangement and dealing with the manufacturer directly after using Plaintiff to establish contacts in Mexico.

To support its version of events, Plaintiff specifically points to (1) Gershon's testimony that Tentler knew that Plaintiff was going to use a third party to manufacture the apparel and (2) Tentler's email at the very end of negotiations suggesting that Iconix not address the status of the contract with Gershon until after it signed an agreement with a more reliable partner.[5] Plaintiff further highlights the fact that Defendants received nearly twice as much up front royalty payment from Future Export as they would have received from Plaintiff. (Pl. Supp. Brief, Apr. 3, 2009.) The Court finds that Plaintiff's version of events, if accepted by a jury, could support a claim for tortious interference. Accordingly, Defendant Iconix's motion for summary judgment is denied.

### 3. Defendants' Motion for Summary Judgment for Injurious Falsehood Claim

Plaintiff's third claim alleges that Defendants made false claims about Plaintiff to third parties that caused harm to Plaintiff. To prevail on a claim for injurious falsehood, a plaintiff must prove the following: (1) the falsity of the alleged statements; (2) publication to a third person; (3) malice; and (4) special damages.

*Berwick v. New World Network Int'l, Ltd.,* No. 06–CV–2641, 2007 WL 949767, at *15 (S.D.N.Y. Mar. 28, 2007).

Plaintiff's claims concerning Defendants' alleged falsehoods have lacked consistency. Plaintiff's amended complaint alleges that Defendants conveyed false information to Future Export with the intention of compromising Plaintiff's business position with Future Export. Plaintiff abandoned this theory in its briefing, which is understandable given Gershon's testimony that the relationship with Future Export was abandoned by Plaintiff (not because of any false information given by Iconix to Future Export), as well as Plaintiff's inability to identify a single person at Future Export to whom Defendants had given false statements. (Gershon Dep., at 238–239, 242,-233.)

Plaintiff's briefing instead alleges that false statements were made to a different party, Rocawear, with whom Plaintiff had been negotiating in regards to other brands. The Court finds this alternative theory equally lacking. Plaintiff's only evidence of these alleged statements is Gershon's secondhand account of what Defendants said to representatives of Rocawear. Gershon never claims to have been present when any of the alleged statements were made. Moreover, Gershon could not identify to whom the statements were made, who informed him of the statements, or when the statements were made. (Gershon Dep., at 233–237.) Finally, Plaintiff has brought forth no independent evidence to support the claim that injurious falsehoods were made by Defendants. Gershon's testimony that some unidentified representative of Iconix made a false

Iconix knew of the contract and that Plaintiff could establish damages. And as for first element, because the Court has determined that the existence of the contract is a disputed issue of fact, the Court will not resolve the claim on that ground at this stage.

5. The email in question was sent by Tentler on October 19, 2006. (Email of Gail Tentler, Oct. 19, 2006, Ex. L Bowles Decl.)

statement to an unspecified person at Rocawear out of his presence is insufficient to defeat Defendants' motion of summary judgment. *Cf. Albert v. Loksen*, 239 F.3d 256, 266 (2d Cir.2001) ("When challenged on a motion for summary judgment, a plaintiff may not rely solely on hearsay or conclusory allegations that the slanderous statement was made.") (quotation omitted); *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.1999). Defendants' motion for summary judgment on the injurious falsehood claim is accordingly granted.[6]

### 4. *Defendants' Motion for Summary Judgment for Quantum Meruit Claim*

 Plaintiff's fourth claim is for quantum meruit. It is settled law that "a promisee who partially performs at a promisor's request ... may recover the fair and reasonable value of the performance rendered, regardless of the enforceability of the original agreement." *Farash v. Sykes Datatronics*, 59 N.Y.2d 500, 506, 465 N.Y.S.2d 917, 452 N.E.2d 1245 (1983). Accordingly, even if the breach of contract action does not lie in this case, Plaintiff may still seek recovery for damages under a theory of quantum meruit.

 In order to prevail on a quantum meruit claim, a plaintiff has to establish the following: (1) performance of services in good faith; (2) the acceptance of those services by a defendant; (3) an expectation of compensation; and (4) the reasonable value of the services. *Geraldi v. Melamid*, 212 A.D.2d 575, 622 N.Y.S.2d 742, 742 (2d Dep't 1995). In case where a defendant is a wrongdoer, a plaintiff can recover damages that would restore him to his former status. A plaintiff's damages are not restricted to the enrichment or

benefit conferred upon the Defendant. *Farash*, 59 N.Y.2d at 505, 465 N.Y.S.2d 917, 452 N.E.2d 1245 (citation omitted). As a result of the competing versions of events set forth by the parties, the Court finds that there are genuine issues of fact with regard to Plaintiff's quantum meruit claim. Defendants' motion for summary judgment on Plaintiff's quantum meruit claim is therefore denied.

Defendants move for summary judgment, arguing that Plaintiff never took any actions in performance of the Licensing Agreement and that Defendants never asked Plaintiff to start performing on the agreement. Defendants argue that Plaintiff's actions were committed in the hopes that the Licensing Agreement would be awarded and were therefore "merely preparatory to performance" and not compensable in quasi-contact. *Absher Const. Corp. v. Colin*, 233 A.D.2d 279, 649 N.Y.S.2d 174, 175 (2d Dep't 1996); *see also Rogers v. HSN Direct Joint Venture*, 1999 WL 595533, at *2 (S.D.N.Y. Aug. 6, 1999) (holding that performance in preparation of an agreement are not compensable in quasi-contract).

There are, however, several facts that cut strongly against Defendants arguments. Gershon testified that he was given assurances by Defendants that there was an agreement in principle for the licensing of Mudd and that Defendants therefore gave Gershon the "green light" to sign agreements with manufacturers and retail distributers. The deals that Gershon negotiated with manufacturers and retail distributers included a three million dollar guarantee by two retailers willing to sell Mudd apparel for one year. (Gershon Dep., at 166–167, 249–250.) Gershon further testified that he had pending

---

6. Defendants also move to dismiss on statute of limitations grounds. However, the Court does not reach that issue as the summary judgment motion is dismissed on alternative grounds.

arrangements with those manufacturers and distributers concerning other brands that have since been abandoned because he lost credibility when Defendants did not give him the license after authorizing him to start negotiating on behalf of the Mudd brand. (Gershon Dep., at 175–176, 245–249.) In essence, Gershon alleges that he employed his contacts on behalf of Mudd and was damaged when Defendants did an about-face after telling him that the parties he had an agreement in principle.

Based on Gershon's testimony, the Court finds that a reasonable jury could conclude that Plaintiff negotiated the manufacturing and distribution arrangements in good faith, Defendants knowingly accepted the performance, Plaintiff expected compensation for setting up the arraignments, and Plaintiff can establish a reasonable value of the services. Reading the facts in a light most favorable to Plaintiff, Defendants knew that Plaintiff's primary task under the Licensing Agreement would be to set up sublicensing agreements with manufacturers and distribution agreements with retailers, which is what Gershon did after receiving Plaintiff's consent. (Gershon Dep., 75–76, 141, 104–105.) According to Plaintiff's version of events, its activity was not merely preparatory but was quintessential performance as understood by the parties during their negotiations. Moreover, Defendants allegedly encouraged Plaintiff to take these steps, and as a result relationships of economic value to Plaintiff deteriorated and specific deals concerning other brands that were amidst negotiations went awry. (Gershon Dep., 175–176, 245–249.) As the Court finds that there are genuine issues of material of fact relating to the elements of Plaintiff's quantum meruit claim, Defendants' motion for summary judgment is denied.

## IV. Conclusion

For the foregoing reasons, Plaintiff's and Defendants' motions for summary judgment on the breach of contract claim are denied. Defendants' motions for summary judgment on Plaintiff's tortious interference and quantum meruit claims are also denied. However, Defendants' motion for summary judgment on Plaintiff's injurious falsehood claim is granted. The parties are to advise the Court in writing by May 27, 2009 the amount of time that they will need to complete all discovery, submit a pretrial order, and be ready for trial.

**SO ORDERED.**