**STRUCTURED CAPITAL SOLUTIONS, LLC, Plaintiff,**

v.

**COMMERZBANK AG, New York Branch, Defendant.**

**15 Civ. 905 (JSR)**

United States District Court, S.D. New York.

Signed April 17, 2016

---

4. *See id.* § 1182(d)(5)(A).

Felipe Sebastian Bohnet-Gomez, Zerbe, Fingeret, Frank & Jadav, P.C., Washington, DC, Jefferson H. Read, John H. Dies, Matthew T. Noll, Zerbe, Fingeret, Frank & Jadav, Houston, TX, for Plaintiff Structured Capital Solutions, LLC.

C. William Phillips, Philip Alexander Irwin, Bruce Oliver Corey, Jr., Jonathan David Cohen, Corey Covington & Burling LLP, New York, NY, for Defendant Commerzbank AG, New York Branch.

## OPINION AND ORDER

### JED S. RAKOFF, UNITED STATES DISTRICT JUDGE.

In this action, plaintiff, which develops and markets proprietary structured finance transaction strategies, seeks to recover damages that it alleges it suffered as a result of defendant's utilization of one such strategy in violation of an agreement between the parties. In particular, plaintiff Structured Capital Solutions, LLC ("SCS") seeks to recover damages for breach of contract, unjust enrichment, misappropriation of trade secrets, and fraud. Before the Court is the motion of defendant Commerzbank AG, New York Branch ("Commerzbank") for summary judgment on all claims. For the reasons explained below, the Court grants summary judgment to defendant on plaintiff's unjust enrichment, misappropriation of trade secrets, and fraud claims, but denies summary judgment on plaintiff's breach of contract claim.

SCS is a "structured finance advisory and arranging boutique operating in the U.S., U.K., and in Europe." Pl.'s Local Rule 56.1 Statement of Material Facts ("Pl.'s Stmt.") ¶ 140, ECF No. 49.[1] Defendant Commerzbank is a branch of Com-

---

1. All citations to a party's Local Rule 56.1 Statement are admitted in relevant part by the opposing party for purposes of the instant motion, unless otherwise noted.

merzbank AG, a banking and financial services company located in Frankfurt, Germany. *See id.* ¶ 141. Since 2009, SCS has been marketing what it describes as the "deferred asset delivery" transaction (the "DAD Transaction") to large financial institutions such as Commerzbank. *See* Def.'s Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Def.'s Stmt.") ¶¶ 1, 9, ECF No. 40. The DAD Transaction is a multi-step transaction designed to create a tax-related benefit utilizing net operating losses or capital losses. *See id.* ¶ 5. The party receiving the benefits from the transaction is the "principal" in the transaction, while the counterparty that earns a fee for facilitating the transaction is the "accommodation party." *Id.* The DAD Transaction proceeds in three steps:

> On Day 1, the party receiving the tax, accounting, and/or regulatory capital benefits of the transaction (the "principal") receives assets from the counterparty in exchange for a relatively small amount of cash and a promise to deliver additional "suitable property" in the future. The principal's tax basis in the assets at the time of the exchange is the amount of cash it paid, which is significantly less than the fair market value of the assets . . . .

> The principal then uses a mark-to-market or similar technique to recognize a taxable gain equal to the difference between the assets' low tax basis and fair market value. Once the gain is recognized, the tax basis in the assets increases to the assets' fair market value. . . .

> Finally, after some delay, the principal delivers other "suitable property" to the counterparty. Due to rules governing the taxation of barter transactions, the effect of the delayed delivery is to increase the principal's basis in the assets it acquired on Day 1 *above* their fair

market value by the amount of suitable property that was delivered . . . .

*Id.* ¶ 7.

Prior to disclosing the DAD Transaction (also referred to herein as the "DAD Information" or the "DAD Technology") to Commerzbank in early 2013, SCS had disclosed it to nonparty Société Générale in May 2011 pursuant to a confidentiality agreement. *See id.* ¶¶ 19–22. In September 2012—before the formation of the relevant business relationship between plaintiff and defendant—Société Générale "pitched" Commerzbank on participating in a DAD Transaction, with Société Générale acting as the principal and Commerzbank as the accommodation party. *See id.* ¶¶ 45, 48–50. At the meeting, Société Générale—without mentioning that the idea for the DAD Transaction originated with SCS or even mentioning SCS at all—disclosed the DAD Transaction to Commerzbank based on an oral assurance from Commerzbank that it would execute a non-disclosure agreement with Société Générale. *See id.* ¶¶ 50–51. Commerzbank subsequently executed the contemplated non-disclosure agreement with Société Générale on September 5, 2012. *See id.* ¶ 52.

At the time of the September 2012 meeting, Société Générale already had a separate DAD Transaction in the works with a hedge fund, in which the hedge fund would serve as the accommodation party. *See id.* ¶ 53. In October 2012, Société Générale proposed that Commerzbank serve as the accommodation party instead, and Commerzbank agreed. *See id.* ¶¶ 55–57. The parties worked on this transaction (the "2013 Transaction") in the fall of 2012 and, by January 8, 2013, Commerzbank had obtained the necessary internal approvals for the transaction from its "Kredit Komitee" in Germany and its Board. *See id.* ¶¶ 58, 62–64. While the closing of the

transaction was delayed until April 23, 2013, *see id.* ¶ 66, "no significant changes were made" to the 2013 Transaction after January 8, 2013, and "no further internal approvals were sought or obtained," *see id.* ¶ 65.

While Commerzbank was pursuing a DAD Transaction with Société Générale in late 2012, it was also exploring obtaining proprietary information from SCS. To this end, an introductory meeting was held between the parties on October 16, 2012 at Commerzbank's London offices. *See* Pl.'s Stmt. ¶ 142. The parties met again in New York on November 9, 2012 for an initial pitch meeting regarding SCS's services (though they dispute whether the DAD Transaction was discussed). *See id.* ¶ 143. After the November 9 meeting, the parties began drafting and negotiating the agreement that would govern SCS's disclosure of proprietary information to Commerzbank. *See id.* ¶ 144. On or about January 18, 2013—after Commerzbank's 2013 Transaction with Société Générale had been finalized in significant part—the parties executed an Information Use and Disclosure Agreement (the "IUDA"). *See* Def.'s Stmt. ¶ 73. Among other things, the IUDA provided that its purpose was to "enable [Commerzbank] to evaluate, and potentially execute transactions (together with substantially similar transactions . . . a 'Transaction') described (a) in a summary presentation ('Presentation') entitled 'Asset Acquisition Structures' that SCS will provide [Commerzbank] . . . and (b) in additional confidential information SCS will provide [Commerzbank] regarding and expanding upon such Presentation." Decl. of William Donohue dated Sept. 4, 2015 ("Donohue Decl. dated Sept. 4, 2015"), Ex. 9 (the "IUDA"), § 1, ECF No. 43-9. The IUDA further provided that Commerzbank "cannot use any Confidential Information or proceed with, or participate in, a Transaction unless [Commerzbank] has en-

tered into a Fee Agreement with SCS." *Id.* § 6. The parties also agreed that the IUDA would be governed by New York law and, where applicable, federal law. *See id.* § 16.

As contemplated by Section 1 of the IUDA, SCS emailed Commerzbank a PowerPoint presentation (the "January 2013 Presentation") disclosing the DAD Transaction on January 29, 2013. *See* Def.'s Stmt. ¶ 81. This disclosure included additional and different information that was not included in SCS's disclosures to Société Générale. *See* Pl.'s Stmt. ¶ 237. A little over a week later, on February 6, 2013, SCS met with Commerzbank to discuss the January 2013 Presentation and to answer Commerzbank's questions regarding the DAD Transaction. *See id.* ¶ 235.

About a year later, in February 2014, Commerzbank executed another DAD Transaction with Société Générale (the "2014 Transaction"), the goal of which was to preserve net operating losses at Hypothekenbank Frankfurt AG ("HFNY"), a Commerzbank AG subsidiary. *See* Def.'s Stmt. ¶ 131. At the time of the transaction, HFNY's closure was imminent and Commerzbank was on the verge of losing its ability to utilize $900 million in net operating losses at HFNY. *See* Pl.'s Stmt. ¶¶ 213–14. To avoid that result, Commerzbank, acting as the principal in the transaction, moved approximately $140 million of HFNY's tax losses to a special-purpose vehicle. *See* Def.'s Stmt. ¶¶ 132–34. Commerzbank did not enter into a fee agreement with SCS prior to executing either the 2013 Transaction or the 2014 Transaction. *See* Pl.'s Stmt. ¶¶ 211–12. This litigation ensued.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is warranted when the "movant shows that there is no genuine dispute as to any mate-

rial fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). In considering a motion for summary judgment, the Court must "construe all the evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Amidon v. Student Ass'n of State Univ. of New York at Albany,* 508 F.3d 94, 98 (2d Cir.2007).

▪ Beginning with plaintiff's breach of contract claim, SCS argues that Commerzbank breached Sections 3, 6, and 7 of the IUDA.[2] Section 6—on which the parties focus the majority of their attention—purports to obligate Commerzbank to enter into a fee agreement with plaintiff prior to effecting any transaction involving the DAD Information. In relevant part, it provides:

> [Commerzbank] undertakes to enter into a written fee agreement with SCS ("Fee Agreement") prior to it effecting any Transaction for itself or on behalf of an unrelated party. Such fee agreement will be negotiated in good faith and contain a market based fee arrangement which will provide for fee(s) to be paid to SCS by [Commerzbank] upon [Commerzbank] entering into a Transaction. For the avoidance of doubt, [Commerzbank] cannot use any Confidential Information or proceed with, or participate in, a Transaction unless [Commerzbank] has entered into a Fee Agreement with SCS. . . .

IUDA § 6.

"Transaction," in turn, is defined as "transactions [ ]together with substantially similar transactions . . . described (a) in [the January 2013 Presentation] . . . and (b) in additional confidential information

SCS will provide [Commerzbank] regarding and expanding upon such Presentation." *Id.* § 1. There is no dispute that Commerzbank entered into the 2013 Transaction and the 2014 Transaction without first entering into a fee agreement with SCS as contemplated by the IUDA. However, Commerzbank argues that it is entitled to summary judgment as to its alleged breach of Section 6 on various grounds.

▪ Commerzbank submits that its obligation under the IUDA to enter into a fee agreement with SCS reflecting a "market based fee" prior to effecting a DAD Transaction is an unenforceable "agreement to agree" under New York law. It is indeed "well settled . . . that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981).

But while Section 6 requires Commerzbank to "undertake[ ] to enter into a written fee agreement with SCS . . . prior to it effecting any Transaction" and requires this "fee agreement [to] be negotiated in good faith and contain a market based fee arrangement," IUDA § 6, it does not contemplate that the parties *must* reach an agreement. Rather, as the rest of the provision makes unambiguously clear, the IUDA prohibits Commerzbank from effecting a Transaction *unless* the parties have reached an agreement: "For the avoidance of doubt, [Commerzbank] cannot use any Confidential Information or proceed with, or participate in, a Transaction unless [Commerzbank] has entered into a Fee Agreement with SCS. . . ." *Id.* Even

---

**2.** Plaintiff also pleaded breach of Sections 5 and 12 of the IUDA, First Am. Compl. ¶ 103, ECF No. 9, but does not contend that either Section was breached in its briefing nor dispute Commerzbank's argument that Section 5 was not breached as a matter of law. Therefore, these theories of breach are waived and the Court need not address them.

assuming that Commerzbank's obligation to undertake to enter into a fee agreement with SCS is unenforceable, Commerzbank's obligation to refrain from participating in a Transaction unless such agreement is reached is independent of that obligation. Though the obligations are related, there is no reason why the arguable unenforceability of the former obligation should extinguish the latter obligation, particularly given that such a result would eliminate one of the primary purposes of the contract. *See Postlewaite v. McGraw–Hill, Inc.*, 411 F.3d 63, 67 (2d Cir.2005) ("Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract."); *Smith v. City of Buffalo*, 120 A.D.3d 1588, 992 N.Y.S.2d 816, 818 (4th Dep't 2014) ("[A] contract must be interpreted so as to give effect to, not nullify, its general or primary purpose." (internal quotation marks omitted)). Indeed, the IUDA provides that "[i]n the event that [a] court deems any provision of this Agreement unenforceable, such invalid portion shall be deleted and the Agreement will continue in effect as to all other provisions there in." IUDA § 21.

■ The result might be different if SCS were, for example, suing defendant because the parties failed to reach agreement on a fee after attempting to negotiate

one and Commerzbank subsequently abandoned the hypothetical transaction. If that were the case, Commerzbank would have a compelling argument that its "agreement to agree" with SCS could not be enforced.[3] But that is not what happened here and it is not SCS's theory of breach. Rather, SCS is suing Commerzbank for entering into transactions that it agreed not to enter into unless certain conditions were satisfied. For that reason, Commerzbank's argument that it could not have breached Section 6 because Section 6 constitutes an unenforceable "agreement to agree" fails.

■ Commerzbank's better argument is that if it already knew the information that SCS disclosed to it, then the IUDA fails for lack of consideration.

■ As a threshold matter, plaintiff's argument that Commerzbank has waived this argument is unavailing. Under New York law, waiver requires "an intentional relinquishment of a known right and should not be lightly presumed." *Gilbert Frank Corp. v. Fed. Ins. Co.*, 70 N.Y.2d 966, 968, 525 N.Y.S.2d 793, 520 N.E.2d 512 (1988). "Such intention must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act." *Echostar Satellite L.L.C. v. ESPN, Inc.*, 79 A.D.3d 614, 914 N.Y.S.2d 35, 39 (1st Dep't 2010) (internal quotation marks omitted).

---

**3.** To be sure, a seemingly indefinite contract term can still be enforceable under New York law if the agreement (1) provides "a methodology for determining [the missing term]" or (2) "invite[s] recourse to an objective extrinsic event, condition or standard on which the amount was made to depend." *Joseph Martin, Jr., Delicatessen, Inc.*, 52 N.Y.2d at 110, 436 N.Y.S.2d 247, 417 N.E.2d 541. For such a term to be enforceable, however, "custom and usage evidence must establish that the omitted term is 'fixed and invariable' in the industry in question." *Hutner v. Greene*, 734 F.2d 896, 900 (2d Cir.1984). The deposition testimony in this case revealed that the "usual range for fees in structured finance transactions [is] 1 to 10%, varying with the overall economic benefit achieved by the transaction." Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 15, ECF No. 48. A measure that is merely a percentage range, "by definition, is not fixed and invariable." *Gutkowski v. Steinbrenner*, 680 F.Supp.2d 602, 611 (S.D.N.Y.2010); *see also Alter v. Bogoricin*, 1997 WL 691332, at *7 (S.D.N.Y. Nov. 6, 1997) (provision of profit-sharing agreement that provided that plaintiff's profit share "shall be in the range of 10%" was unenforceable).

SCS contends that Commerzbank waived its right to dispute (or is alternatively estopped from disputing) the novelty of the DAD Information because it failed to comply with its duty under Section 7 of the IUDA to "promptly notify [SCS] if it believes that any Confidential Information received is excepted pursuant to this Section 7." IUDA § 7. In support, SCS points to a January 22, 2013 email sent by Nicholas Sopkin, the Managing Director of Commerzbank's Structured Capital Markets team, shortly after Commerzbank executed the IUDA, in which Sopkin advised colleagues that he "want[ed] to make sure we put [plaintiff] on notice for anything they show us which is already known to us." Decl. of Jefferson H. Read dated Sept. 21, 2015 ("Read Decl."), Ex. 20. Commerzbank admits in its reply brief that it "did not promptly provide notice" to SCS of its belief that some or all of the information it received from SCS fell within the carve-outs set forth in Section 7 of the IUDA. Def. Commerzbank AG, New York Branch's Reply Mem. of Law in Further Support of Its Mot. for Summ. J. ("Def.'s Reply Br.") at 9, ECF No. 51 at 13.

SCS's waiver argument fails, however, for three reasons. First, while Commerzbank was plainly required to notify SCS of information it believed was non-confidential, SCS fails to articulate how this obligation qualifies as a "right" of defendant's that may be waived. Section 7 does not make its confidentiality carve-outs turn on whether Commerzbank notifies SCS that an exception applies—excepted information is non-confidential regardless of whether Commerzbank gives notice. For that reason, there was no "right" for Commerzbank to waive. Second, Commerzbank's argument that it is not required to pay a fee under Section 6 of the IUDA if the information disclosed to it was not *novel* is not equivalent to an argument that it is not required to pay a fee if the information provided to it was not *confidential* pursuant to Section 7. Third, even to the extent the notice requirement could be construed as a "right to assert novelty," the IUDA provides that "no ... waiver of [the IUDA's] provisions will be binding upon either party, unless approved in writing by each party." IUDA § 19. No-waiver clauses are enforceable under New York law and there was no such written waiver here. *See Awards.com, LLC v. Kinko's, Inc.,* 42 A.D.3d 178, 834 N.Y.S.2d 147, 155 (1st Dep't 2007) (noting that no-waiver clauses "are uniformly enforced").[4]

 Turning to the merits of Commerzbank's novelty argument, it is well established under New York law that "submission of idea" contracts[5]—such as the one at issue here—fail for lack of consideration where the submitted idea is already known to the receiving party and thus has no value to the receiving party. *See Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368, 380 (2d Cir.2000) (holding that in submission of idea cases breach of contract claims require "a showing that the disclosed idea was novel to the buyer in order to find consideration"); *Sokol Holdings, Inc. v. BMB Munai, Inc.,* 726 F.Supp.2d

---

4. As for estoppel, SCS says nothing about it except that the Court should find it in the alternative. The Court need not consider arguments that are not actually made.

5. The Second Circuit describes a classic submission of idea case as follows: "(1) the parties enter into a pre-disclosure confidentiality agreement; (2) the idea is subsequently disclosed to the prospective buyer; (3) there is no post-disclosure contract for payment based on use; and (4) plaintiff sues defendant for allegedly using the disclosed idea under either a contract-based or property-based theory." *Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368, 373–74 (2d Cir.2000)

291, 300 (S.D.N.Y.2010) ("Defendants cannot be liable for breaching the confidentiality agreement because no ideas in the [plaintiffs'] Business Plan were novel to Defendants."); *Hudson v. Universal Studios, Inc.*, 2008 WL 4701488, at *7 (S.D.N.Y. Oct. 23, 2008) ("[N]ovelty to the buyer, not novelty to the world generally, determines whether an idea has value to a defendant." (internal quotation marks omitted)). As the New York Court of Appeals has explained:

> [T]here is no equity in enforcing a seemingly valid contract when, in fact, it turns out upon disclosure that the buyer already possessed the idea. In such instances, the disclosure, though freely bargained for, is manifestly without value. A showing of novelty, at least novelty as to the buyer, addresses these two concerns. Novelty can then serve to establish ... the value of the consideration—the disclosure—necessary for contract-based claims.

*Apfel v. Prudential–Bache Sec. Inc.*, 81 N.Y.2d 470, 478, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (1993).[6]

█ SCS responds that the IUDA is supported by consideration other than the disclosure of the DAD Information—specifically, SCS's advisory services and its potential introductions of Commerzbank to counterparties. *See Hamer v. Sidway*, 124 N.Y. 538, 545, 27 N.E. 256 (1892) (defining consideration as "some right, interest, profit or benefit accruing to the one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other." (internal quotation mark omitted)). To prove it, SCS points

to the IUDA's recitals, which provide, in relevant part:

> WHEREAS [Commerzbank] wishes to be advised by SCS and to engage in discussions for the purpose of [Commerzbank] evaluating potential transactions and where appropriate have SCS introduce potential counterparties ("SCS Clients") for such transactions. ... NOW, THEREFORE, in consideration of the foregoing recitals and other good and valuable consideration ... the parties agree as follows:

IUDA at 1.

█ But while "New York law holds that a 'whereas' clause can be used to clarify the meaning of an ambiguous contract," a recital "cannot be used to modify or create substantive rights not found in the contract's operative clauses." *RSL Commc'ns, PLC v. Bildirici*, 2010 WL 846551, at *4 (S.D.N.Y. Mar. 5, 2010) (citing, *inter alia, Ross v. Ross*, 233 A.D. 626, 253 N.Y.S. 871, 882 (1st Dep't 1931) ("The recitals in a contract form no part thereof. ..."); *Tuition Plan, Inc. v. Zicari*, 70 Misc.2d 918, 335 N.Y.S.2d 95, 99–100 (Dist.Ct., Suffolk Cnty.1972) ("Even though a recital of consideration is made by language in the agreement, this does not preclude the parties from disputing consideration and does not in itself give the promise any validity."). And, under New York law, a "non-binding pr[o]mise is deemed insufficient consideration." *Tuition Plan, Inc.*, 335 N.Y.S.2d at 100 (citing *Topken, Loring & Schwartz v. Schwartz*, 249 N.Y. 206, 163 N.E. 735 (1928)). As such, SCS cannot point to the IUDA's recitals—particularly one which speaks in precatory terms—as consideration. Rather, SCS's consideration for

---

6. *Apfel* drew a distinction between cases where "the buyer and seller contract for *disclosure* of the idea with payment based on use" and cases where "a contract to use an idea [is] entered into *after* the disclosure of the idea." *Apfel,* 81 N.Y.2d at 477–78, 600 N.Y.S.2d 433, 616 N.E.2d 1095. Novelty is required to supply consideration in the former situation (*i.e.,* the situation here) but not the latter. *See id.*

Commerzbank's undertakings in the IUDA was plainly the ideas it disclosed under that agreement.[7]

Plaintiff also contends that the novelty requirement is only triggered where the idea was obtained or known independently of the disclosing party—and it is undisputed that to the extent Commerzbank already knew the DAD Information, it knew it from Société Générale, which knew it from plaintiff. To support this proposition, SCS plucks out of context the Second Circuit's observation in *Nadel*, by way of a footnote, that "where there is an independent source for the idea used by the defendant, there may be no breach of contract, and the plaintiff's claim for recovery may not lie." *Nadel*, 208 F.3d at 380 n. 10. The Second Circuit made that point in the course of emphasizing that even if a disclosed idea is novel to the receiving party, its use does not necessarily give rise to a breach of contract action unless the plaintiff can "demonstrate some nexus or causal connection between his or her disclosure and the defendant's use of the idea, *i.e.*, where there is an independent source for the idea used by the defendant, there may be no breach of contract, and the plaintiff's claim for recovery may not lie." *Id.* (citing *Ferber v. Sterndent Corp.*, 51 N.Y.2d 782, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (1980) for proposition that "even if plaintiff's idea were novel to the defendant at the time of disclosure, his claim would have been ex-

tinguished when the idea subsequently fell into the public domain"). The issue under *Nadel* and its progeny is whether the idea was novel to the receiving party, not whether the idea was obtained independently of the disclosing party. If the idea is not novel to the receiving party because the receiving party obtained it through improper means, then that might give rise to a misappropriation claim. But it cannot create consideration where none exists.[8]

In any case, even if the contract were not void for lack of consideration in the event that SCS's disclosures were not novel to Commerzbank, Section 6 of the IUDA could not be interpreted to require Commerzbank to enter into a fee agreement with SCS prior to executing a DAD Transaction under such circumstances. Such a result would be commercially unreasonable and absurd. *See Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, 2015 WL 4940126, at *5 (S.D.N.Y. Aug. 10, 2015) ("[A] contract should not be interpreted to produce a result that is absurd [or] commercially unreasonable" (internal quotation mark omitted)). To illustrate the absurdity, imagine that, pursuant to the IUDA, SCS disclosed to Commerzbank the universally understood concept of a loan. Reading Section 6 to require Commerzbank, a sophisticated financial institution, to negotiate a fee with SCS each time it subsequently wished to enter into a loan is plainly untenable.[9] The same is true here

7. Moreover, the "advisory services" that the IUDA contemplates appear to be nothing more than elaboration on and explanation of SCS's ideas. Thus, Section 1 of the IUDA refers to the January 2013 Presentation and "additional confidential information SCS will provide [Commerzbank] regarding and expanding upon such Presentation." IUDA § 1. Even the recital on which SCS relies provides that Commerzbank "wishes to be advised by SCS ... *for the purpose of [Commerzbank ] evaluating potential transactions.*" IUDA at 1 (emphasis added).

8. What is more, Société Générale was under no obligation to maintain the confidentiality of the DAD Information for essentially the same reasons that Commerzbank was under no such obligation. Those reasons are addressed in the Court's discussion of plaintiff's misappropriation of trade secrets claim below.

9. This is not to say that Commerzbank would not have other potential defenses or claims in this hypothetical scenario.

if, in fact, Commerzbank already completely knew and understood the information disclosed in SCS's January 2013 Presentation.[10]

That novelty was required does not mean that novelty was absent. The former is a legal question, the latter a factual one that Commerzbank must show is not genuinely disputed in order to prevail on this motion.

■ As to the 2013 Transaction in which Commerzbank served as a counterparty on a DAD Transaction with Société Générale, Commerzbank has conclusively established that it knew the relevant DAD Information that informed the structure of that Transaction prior to SCS's disclosures under the IUDA. SCS does not genuinely dispute that Société Générale explained to Commerzbank the details of the DAD Transaction in September 2012, Def.'s Stmt. ¶¶ 47–50, 59–60,[11] that Commerzbank obtained internal approvals for the 2013 Transaction prior to entering into the IUDA, id. ¶¶ 63–64, and that no significant changes were made to the Transaction after January 8, 2013 (i.e., prior to the execution of the IUDA), id. ¶ 65. As such, there is no genuine factual dispute that the 2013 Transaction was based on Commerzbank's preexisting knowledge of the DAD Transaction from Société Générale and

that SCS did not disclose anything novel to Commerzbank that Commerzbank used in structuring the 2013 Transaction.[12] For that reason, as a matter of law, Commerzbank was not obligated to negotiate a fee agreement with SCS prior to executing the 2013 Transaction. Cf. Nadel, 208 F.3d at 380 n. 10 ("In order to recover for breach of contract, a plaintiff must demonstrate some nexus or causal connection between his or her disclosure and the defendant's use of the idea . . . .").

■ The parties vigorously dispute, however, whether SCS's disclosures provided Commerzbank with novel information that informed the 2014 Transaction. Commerzbank asserts that upon receiving the January 2013 Presentation it "recognized that, based on its prior dealings with [Société Générale] and its prior experience, it already knew the DAD information contained in the [January 2013] Presentation, including the core steps and structure of the DAD Transaction section of the Presentation." Def.'s Stmt. ¶ 98; see also Donohue Decl. dated Sept. 4, 2015, ¶¶ 18–20. While Bill Donohue, a Commerzbank employee who worked on the 2014 Transaction, did not have prior knowledge of the information contained in the "Moving to Affiliate" section of the January 2013 Presentation, Donohue Decl. dated Sept. 4, 2015, ¶ 19, defendant's outside consultant

10. SCS responds that Commerzbank did not enter into the IUDA based on representations that SCS would disclose something "novel," but rather was in a position to evaluate the potential value of SCS's ideas and information based on SCS's pre-IUDA discloses. But the point of the hypothetical is to illustrate that SCS *could* have disclosed a loan and—under SCS's interpretation of the IUDA—Commerzbank would have been required to negotiate a fee agreement with SCS prior to effecting any subsequent loan.

11. SCS failed to controvert these facts in its Local Rule 56.1 counterstatement and the Court therefore treats them as undisputed.

In addition, SCS explicitly admitted that "[Société Générale] disclosed the details of the DAD Transaction in [the September 2012 meeting between Société Générale and Commerzbank]." Def.'s Stmt. ¶ 50.

12. SCS contends that it "provided general information on the DAD transaction technology" at the November 9, 2012 pitch meeting between the parties, which Commerzbank disputes. Pl.'s Stmt. ¶ 143. But SCS does not contend that it discussed the DAD Information in any detail at this meeting or that Commerzbank learned anything novel from this discussion that informed the 2013 Transaction.

who contemporaneously reviewed the Presentation avers that he was very familiar with the type of transactions referred to in the "Moving to Affiliate" section and had worked on numerous such transactions. *See* Decl. of Leon Kozak dated Aug. 31, 2015, ¶¶ 3–6, ECF No. 44.

However, taking the contemporaneous evidence as a whole, a genuine issue of fact exists as to whether Commerzbank received any novel information or insights from SCS that informed the 2014 Transaction. While Commerzbank contends it already fully understood the DAD Information prior to SCS's disclosures, plaintiff points to a December 19, 2012 email in which Paul Burrows, another member of Commerzbank's structured finance group, responded to an email from Donohue describing the regulatory capital benefits achieved by Société Générale in the 2013 Transaction by asking whether it was "fair to say that this type of trade [*i.e.*, the 2013 Transaction] isn't really going to work for us in [Société Générale's] position (as we don't have the profit projections to support either a DTA on [brought forward] losses or on timing differences)." Read. Decl., Ex. 26.[13] Plaintiff also cites the testimony of another Commerzbank employee that the email reflected that "we did not think this [type of transaction] would work for us as a principal, no." *Id.*, Ex. 9 at 73:13–19.

Commerzbank counters that its "understanding of the DAD transaction structure is a different question than whether Commerzbank was in the same position as [Société Générale] and could take advantage of its regulatory capital benefits." Def.'s Reply to Pl.'s Local Rule 56.1 Statement of Material Facts ("Def.'s Reply Stmt.") ¶ 59, ECF No. 53. But if Commerzbank doubted it could take Société

Générale's position (as the principal in a DAD Transaction), when in fact it could, that suggests SCS may have disclosed something of value to Commerzbank. By the same token, the fact that Commerzbank did not develop the 2014 Transaction until after SCS's disclosures—and, in fact, began work on a "different alternative" to salvaging HFNY's losses immediately after its February 6, 2013 meeting with SCS—raises a fair inference that SCS's disclosures informed the 2014 Transaction. Read Decl., Ex. 19.

The parties also focus on a February 6, 2013 email in which Donohue states that "[SCS] ha[s] 2 ideas. First is [the Société Générale] trade and second is db trade. Both work to pop a gain so we are half way there. Moving the loss down seems straight forward [sic] but leon [Kozak] hasn't weighed in yet. Interesting dynamic since it's not his idea." Read Decl., Ex. 22. Commerzbank suggests that Donohue's identification of SCS's "first" idea as the Société Générale trade demonstrates that Donohue recognized that he already knew the relevant DAD Information. But this hardly establishes that Commerzbank learned nothing new or relevant from the January 2013 Presentation, particularly given that Donohue was responding to an email from a colleague asking if Kozak "thinks[ ] [plaintiff] really got something," which would suggest that the initial reaction of Commerzbank's employees to the January 2013 Presentation may have been enthusiastic. *Id.*

Significantly, defendant's employees were cognizant of Commerzbank's obligations under Section 7 of the IUDA to notify plaintiff promptly if plaintiff disclosed information that Commerzbank already knew. As noted, Sopkin emailed a

---

13. Donohue responded that "[w]e've been thinking about if we can take [Société Géné-

rale's] position" and described "[t]wo possible ways." Read. Decl., Ex. 26.

colleague on January 22, 2013, shortly after signing the IUDA on behalf of defendant, referring to the IUDA's "carve outs for information we already know about" and stating that he "want[ed] to make sure we put [plaintiff] on notice for anything they show us which is already known to us." Read Decl., Ex. 20. That Commerzbank admittedly failed to notify SCS of any such information until the initiation of this dispute raises a reasonable inference that it did not believe the information was entirely known to it at the time it was presented. Indeed, in *Nadel*, the Second Circuit held in an analogous situation that the fact that the defendant failed to promptly return a prototype to the plaintiff-inventor, even though "custom in the toy industry provides that a company shall promptly return all samples if it already possesses ... a disclosed idea," gave rise to a reasonable inference that the prototype was novel to the defendant. *Nadel*, 208 F.3d at 381 (finding genuine issue of fact existed as to novelty).

Moreover, drafts of Commerzbank's internal Tactics Approval Forms dating to March and May 2013 indicate that Commerzbank was contemplating paying SCS an estimated fee of $1 million in connection with the 2014 Transaction. *See* Read Decl., Exs. 14–16. And while Commerzbank attempts to trivialize these documents, Bill Donohue testified at deposition that, as of May 29, 2013, "it was a possibility" a fee would be paid to SCS. Read Decl., Ex. 2 at 101:22–102:2. The parties also dispute to what extent they engaged in follow-up discussion regarding the DAD Information after February 6, 2013, *see* Def.'s Reply Stmt. ¶ 236, and even the basic question of whether the 2014 Transaction used the three steps of the DAD Transaction, *see id.* ¶ 208.

In sum, resolving ambiguities and drawing all reasonable inferences in plaintiff's favor, there is a genuine issue of fact as to whether any of SCS's disclosures under the IUDA were novel to Commerzbank and, if so, whether such information or insights in any way informed the 2014 Transaction. If SCS supplied Commerzbank with novel information that informed the 2014 Transaction, Commerzbank breached Section 6 of the IUDA by entering into a DAD Transaction without first negotiating a fee agreement with SCS. If SCS did not supply such information, then the IUDA fails for lack of consideration. To be sure, defendant knew much about the DAD Transaction from Société Générale prior to SCS's disclosures and plaintiff has not fully articulated precisely what information it disclosed to Commerzbank that was both novel to Commerzbank and employed in the 2014 Transaction. It will be plaintiff's burden to do so at trial. But plaintiff has marshalled more than enough evidence to defeat summary judgment on this issue.

Two other theories of breach must be briefly addressed before turning to plaintiff's remaining claims. First, SCS argues that Commerzbank breached Section 3 of the IUDA, which provides, *inter alia*, that "[f]or the avoidance of doubt, [Commerzbank] will not use any information, whether confidential or not, to circumvent, bypass or compete with[ ] [plaintiff]." IUDA § 3. As with Section 6 of the IUDA, the viability of this theory of breach turns on whether SCS disclosed anything novel to Commerzbank that informed the 2014 Transaction.

Second, SCS argues that Commerzbank breached Section 7 of the IUDA by failing to notify plaintiff promptly that it believed, as it contends it contemporaneously did, that an exception to the IUDA's confidentiality obligations applied. *See* IUDA § 7 ("The receiving party shall promptly notify the disclosing party if it believes that any

Confidential Information received is excepted pursuant to this Section 7."). There is no serious dispute that defendant failed to notify plaintiff of what it claims it believed was non-confidential under Section 7. While Commerzbank argues that this was not a material breach, it fails to explain what relevance that has to whether plaintiff is entitled to damages for such breach. To the extent defendant learned nothing novel from plaintiff, the IUDA fails for lack of consideration and defendant is not liable for breaching Section 7. But to the extent defendant did glean novel information from SCS, plaintiff could feasibly have suffered damages arising from a breach of Section 7. Though plaintiff has failed to articulate what those damages might be up until this point, the Court will not foreclose it from pursuing this theory at trial if it articulates those damages in the Pre–Trial Consent Order.[14]

■■■■ Turning to plaintiff's unjust enrichment claim, SCS contends that Commerzbank was unjustly enriched when it "accepted, used, and enjoyed the benefits of the information furnished by SCS when it participated in the 2013 and 2014 transactions." First Am. Compl. ¶ 109, ECF No. 9. To prevail on an unjust enrichment claim under New York law, plaintiff must show: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir.2004). While plaintiff is not required

to elect its remedies where there is a bona fide dispute regarding the validity or enforceability of a contract, *Atlas Partners, LLC*, 2015 WL 4940126, at *12, there can be no unjust enrichment when "the matter is controlled by contract." *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 841 N.E.2d 742 (2005).

■■■■ Here, to the extent SCS's disclosures were novel to and used by Commerzbank, the issue of whether Commerzbank should have paid SCS in connection with executing the 2013 Transaction and 2014 Transaction is governed by the IUDA— which is a valid and enforceable contract in that scenario. To the extent they were not, there can be no unjust enrichment as a matter of law. *See Khreativity Unlimited, Inc. v. Mattel, Inc.*, 2000 WL 1843223, at *2 (2d Cir.2000) ("An idea must be novel to its recipient for the recipient to be unjustly enriched thereby."); *Steinbeck v. Steinbeck Heritage Found.*, 400 Fed.Appx. 572, 578 (2d Cir.2010) (affirming dismissal of unjust enrichment claim on summary judgment where "no benefit derived by [defendant] at [plaintiff's] expense" could be identified). More specifically, as explained above, the unrebutted evidence demonstrates that Commerzbank knew and understood the DAD Information underlying the 2013 Transaction prior to receiving any disclosures from SCS. As such, Commerzbank was not unjustly enriched with respect to the 2013 Transaction as a matter of law. As for the 2014 Transaction, to the extent SCS provided Commerzbank with any novel information that

---

14. Commerzbank also argues that it had no duty to notify SCS that it believed the January 2013 Presentation was not confidential because the Presentation fell under the "tax treatment" / "tax structure" disclaimer of confidentiality, discussed in depth below. While the Court agrees with defendant that the January 2013 Presentation was not confidential, that alone does not relieve defendant

of its notice obligations under Section 7. The IUDA defines "Confidential Information" to include "structure presentations on the Transactions." IUDA § 2. The January 2013 Presentation plainly met that definition, regardless of whether Commerzbank was subject to any confidentiality obligations with respect to it or not.

informed that Transaction, the IUDA governs the issue of Commerzbank's liability. To the extent Commerzbank is found to have learned nothing from SCS it did not already know, Commerzbank was not unjustly enriched as a matter of law. Because SCS cannot prevail on its unjust enrichment claim in either circumstance, the claim must be dismissed.

■■ Commerzbank also moves for summary judgment on SCS's third cause of action for misappropriation of trade secrets. SCS contends that the DAD Information it provided to defendant constituted a trade secret that defendant willfully used in order to enrich itself and to interfere with SCS's ability to conduct business. *See* First Am. Compl. ¶ 117. Under New York law, to prevail on such a claim, SCS must show (1) that "it possessed a trade secret," and (2) that Commerzbank "used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir.1999). New York courts consider various factors in assessing whether information constitutes a trade secret.[15] While "absolute secrecy is not required," *Telerate Sys., Inc. v. Caro*, 689 F.Supp. 221, 232 (S.D.N.Y.1988), "[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished," *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

■ In this case, that principle proves fatal to plaintiff's misappropriation claim. This is because, even assuming *arguendo* that the DAD Transaction was at one time a trade secret, Commerzbank was never under an obligation to maintain its confidentiality. Though, on its face, the IUDA purported to be a confidentiality agreement that bound defendant to preserve the confidentiality of the information SCS disclosed pursuant to it, SCS vitiated these obligations by including the following disclaimer:

> *Notwithstanding anything to the contrary, [Commerzbank] . . . may disclose to any and all persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the Transactions contemplated by this Agreement and all material of any kind (including opinions or other U.S. tax analyses) relating to such tax treatment and tax structure. This paragraph is intended to reflect the understanding of [Commerzbank] and SCS that the Transactions have not been offered under 'conditions of confidentiality,' as that phrase is used in U.S. Treasury Regulation section 1.6011–4(b)(3) . . . .*

IUDA § 7 (emphasis added).

A substantially similar disclaimer appears in the January 2013 Presentation itself, the purpose of which was to "avoid the possibility" that the DAD Transaction would need to be "reported to the IRS," Def.'s Stmt. ¶ 83, pursuant to IRS regulations requiring parties to report certain transactions that are offered under "condi-

---

15. Specifically, New York courts consider: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
*N. Atl. Instruments, Inc.*, 188 F.3d at 44.

tions of confidentiality." *See* 26 C.F.R. § 1.6011–4(b)(3).[16] Under Treasury Regulation § 1.6011–(4)(b)(3)(ii), "[a] transaction is considered to be offered to a taxpayer under conditions of confidentiality"—and thus reportable to the IRS—"if the advisor ... places a limitation on disclosure by the taxpayer of the tax treatment or tax structure of the transaction and the limitation on disclosure protects the confidentiality of that advisor's tax strategies." Furthermore, the regulation defines "tax structure" broadly as *"any fact that may be relevant to, understanding the purported or claimed Federal income tax treatment of the transaction."* § 1.6011–4(c)(9) (emphasis added).

■ That each step of the DAD Transaction represents information "that may be relevant to understanding the purported ... income tax treatment" of the DAD Transaction is established by the testimony of plaintiff's own witnesses. Plaintiff's 30(b)(6) witness testified, for example, that one would need to know "[t]he entire Deferred Asset Delivery presentation" in order to understand Step 1 of the DAD Transaction as outlined in the January 2013 Presentation. Decl. of Philip A. Irwin dated Sept. 8, 2015 ("Irwin Decl, dated Sept. 8, 2015"), Ex. 1 at 82:7–18. He further confirmed that "the core of the transaction" is "related to the tax consequences" and agreed that "[y]ou have to understand one to understand the other." *Id.* at 179:16–21. Similarly, Adam Parr, a Managing Director at SCS who holds a 35% ownership stake in the firm, *see* Def.'s Stmt. ¶ 3, testified that one must understand the "whole" January 2013 Presentation in order to understand the tax basis of the asset acquired, and understand "all" the information in the Presentation in order to understand the other steps in the DAD Transaction. Irwin Decl. dated Sept. 8, 2015, Ex. 25 at 96–101. Consistent with these admissions, defendant's expert submits that most of the January 2013 Presentation consists of "tax treatment" and "tax structure" information and that the "remaining portions are not sufficient to describe a transaction; they are extraneous bits and pieces with the core of a transaction missing." Decl. of Anthony Tuths dated Sept. 3, 2015 ("Tuths Decl."), Ex. 1, ¶ 84, ECF No. 45–1.[17] This testimony is hardly surprising given that, as pleaded by SCS, the "primary effect of [the DAD Transaction] is to create a taxable gain to utilize net operating losses ... or capital losses and, subsequently, create future deductions or losses to offset this gain over time." First Am. Compl. ¶ 23.

If one needs to understand the entire January 2013 Presentation in order to understand the tax consequences of each step of the DAD Transaction, as plaintiff's witnesses testified, then the material within it constitutes "fact[s] that may be relevant to understanding the purported or claimed Federal income tax treatment of the transaction." § 1.6011–4(c)(9). In other words, such material qualifies as the "tax struc-

---

**16.** SCS disclosed the DAD Transaction to Wells Fargo in 2009 and to Société Générale in 2011 pursuant to purported confidentiality agreements that contained similar confidentiality disclaimers. *See* Def.'s Stmt. ¶¶ 8–9, 19–21.

**17.** Plaintiff objects to the opinions of defendant's expert on the ground that they are unsworn and not statements of fact. But Tuths filed a declaration under penalty of perjury attesting that his report as supplemented by his deposition testimony "contains a true and correct statement of [his] background, opinions, and the bases for [his] opinions in this matter," Tuths Decl. ¶ 4, and "courts may rely on expert opinion in granting summary judgment," *Ceglia v. Zuckerberg,* 2013 WL 1208558, at *14 (W.D.N.Y. Mar. 26, 2013), *report and recommendation adopted,* 2014 WL 1224574 (W.D.N.Y. Mar. 25, 2014).

ture of the transaction" under § 1.6011–4(b)(3)(ii). As such, because the IUDA permits Commerzbank to "disclose to any and all persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the Transactions contemplated by this Agreement and all material of any kind ... relating to such tax treatment and tax structure," IUDA § 7, Commerzbank was free to disclose the contents of the January 2013 Presentation to third parties at its discretion. For that reason, the DAD Information was, by definition, not a trade secret. *See Ruckelshaus*, 467 U.S. at 1002, 104 S.Ct. 2862; *Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir.1962) ("The subject matter of a trade secret must be secret."); *Medtech Prods. Inc. v. Ranir, LLC*, 596 F.Supp.2d 778, 804 (S.D.N.Y.2008) ("Of course, the most important consideration in determining whether a piece of information qualifies as a trade secret is whether the information was actually a secret.").

SCS's arguments to the contrary are unpersuasive. First, SCS contends that the confidentiality disclaimer applies to actual, concrete transactions, not abstract ones. As such, according to SCS, the disclaimer "did not have effect until a DAD Transaction was actually executed," which would have been after misappropriation occurred. Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp.") at 22, ECF No. 48 at 27. But this interpretation is contradicted by the plain language of the confidentiality disclaimer, which authorizes disclosure of the "US tax structure of the Transactions *contemplated* by this Agreement and all materials of any kind ... relating to such tax treatment and tax structure." IUDA § 7 (emphasis

added). As noted, the IUDA defines "Transaction," in part, as "transactions ... *described* ... in [the January 2013 Presentation]." *Id.* § 1 (emphasis added).[18] And the IUDA repeatedly uses "Transaction" to refer to a DAD Transaction that has not actually been executed. *See, e.g., id.* § 5 ("[Commerzbank] and SCS may at any time elect to not proceed with any Transaction ..."); *id.* § 7 (repeatedly referring to a "possible Transaction"). There is thus no basis for plaintiff's contention that the disclaimer is triggered only upon the execution of a DAD Transaction; such an interpretation would be entirely unmoored from the IUDA.

Next, SCS argues that there is a factual dispute as to what portions of the DAD Technology constitute "tax treatment" or "tax structure." In support, SCS points to a color-coded version of the January 2013 Presentation that its general counsel, Mark Fuhrman, attached to a declaration submitted in support of plaintiff's opposition papers. *See* Read Decl., Ex. 34. Specifically, Fuhrman color-codes as red the portions of the Presentation that in his view constitute "tax structure" and "tax treatment," and color-codes as green the portions which do not. As an initial matter, according to defendant, SCS failed to disclose Furhman as an expert witness as required by Federal Rule of Civil Procedure 26(a)(2), which would render his opinion testimony inadmissible. But even assuming Fuhrman's testimony is admissible, it is far too conclusory to create a genuine issue of fact. *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 222 (2d Cir. 2004) (holding that conclusory assertions in supporting affidavit did not create genuine

---

18. Similarly, the January 2013 Presentation—which provides that Commerzbank "may disclose ... without limitation of any kind, the tax treatment and tax structure of the Transaction and all materials ... relating to such tax treatment and tax structure"—defines "Transaction" as "the transaction outlined herein." Irwin Decl. dated Sept. 8, 2015, Ex. 2 at i.

issue of fact). Unadorned color-coding without any proffered rationale is not analysis. There is no genuine factual dispute that the January 2013 Presentation was overwhelmingly made up of "fact[s] that may be relevant to understanding the purported or claimed Federal income tax treatment of the [DAD Transaction]," for the simple reason that the deposition testimony of plaintiff's witnesses established as much. § 1.6011–4(c)(9).

Finally, plaintiff objects that "[f]inding that boilerplate disclaimers destroyed the secrecy of SCS's information—in spite of substantial evidence of SCS's efforts to maintain it—would entirely frustrate SCS's confidentiality agreements." Pl.'s Opp. at 23. That may be true, but SCS cannot have it both ways. Either the "tax treatment" and "tax structure" of the Transactions are confidential or they are not. SCS was under no obligation to disclaim the confidentiality of "the U.S. tax treatment and U.S. tax structure of the Transactions." IUDA § 7. It did so to avoid IRS reporting obligations, which would otherwise have been plainly triggered. Having done so, it cannot undermine those reporting regulations by seeking to require confidentiality of such information regardless and by dismissing its confidentiality disclaimer as mere "boilerplate."

■ It is true that "[t]he existence, vel non, of a trade secret usually is treated as a question of fact." Chevron U.S.A., Inc. v. Roxen Serv., Inc., 813 F.2d 26, 29 (2d Cir.1987). But where there is no genuine dispute that the party claiming misappropriation "disclose[d] [its] trade secret to others who are under no obligation to protect the confidentiality of the information ... [its] property right is extinguished" and summary judgment is warranted. Ruckelshaus, 467 U.S. at 1002, 104 S.Ct. 2862; Bear, Stearns Funding, Inc. v. In-terface Grp.-Nevada, Inc., 361 F.Supp.2d 283, 305 (S.D.N.Y.2005) (where "[t]he information that [counterclaimant] contends constitutes trade secrets is information that Bear Stearns was expressly authorized to disclose in connection with a loan securitization ... such information cannot possibly fit within even the broadest interpretation of New York's definition of a trade secret" as a matter of law). Because that is the case here, the Court need not analyze other factors and grants Commerzbank summary judgment on plaintiff's misappropriation claim.

■ SCS's misappropriation claim also fails as a matter of law on the related but independent ground that SCS had disclosed the DAD Transaction to a third party years before, pursuant to a nondisclosure agreement that had long since expired. Specifically, it is undisputed that SCS disclosed the DAD Transaction to Wells Fargo & Company in 2009 under a non-disclosure agreement that expired one year after it was executed. See Def.'s Stmt. ¶¶ 8–11. A number of "courts have denied trade secret protection where allegedly confidential information has been revealed to third parties ... where the information was disclosed under a non-disclosure agreement with only a limited duration." Silicon Image, Inc. v. Analogix Semiconductor, Inc., 2008 WL 166950, at *17 (N.D.Cal. Jan. 17, 2008); DB Riley, Inc. v. AB Eng'g Corp., 977 F.Supp. 84, 91 (D.Mass.1997) (finding that plaintiff did not have a likelihood of success on the merits of its misappropriation claim under Massachusetts law in part because "[plaintiff's] own expectations of maintaining its trade secrets were time limited"); ECT Int'l, Inc. v. Zwerlein, 228 Wis.2d 343, 355–56, 597 N.W.2d 479 (1999) (affirming dismissal of misappropriation claim on summary judgment where confidentiality agreement specified that information was

to be kept confidential for only one year following termination of employment, thereby "manifest[ing] [plaintiff's] intent that after one year there was no need to maintain the secrecy of any sensitive and confidential information").

Plaintiff objects that its disclosure of the DAD Transaction "to a few third parties—under assurances of confidentiality—does not compel the conclusion that SCS did not undertake 'reasonable efforts' to maintain the secrecy of the DAD Technology," Pl.'s Opp. at 22, and that it did not disclose the DAD Transaction publicly. But a temporary pledge to secrecy is exactly that: temporary. Once a third party's confidentiality obligation (assuming *arguendo* one exists) expires, so does the trade secret protection.

■■■■ Finally, Commerzbank seeks summary judgment on plaintiff's fourth cause of action for fraud. Under New York law, the elements of a fraud claim are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Childers v. New York & Presbyterian Hosp.*, 36 F.Supp.3d 292, 309 (S.D.N.Y.2014). To prevail on its fraud claim, plaintiff must show by clear and convincing evidence both that it "actually relied" on a fraudulent statement and that its "reliance was reasonable or justifiable." *KNK Enters., Inc. v. Harriman Enters., Inc.*, 33 A.D.3d 872, 824 N.Y.S.2d 307, 307 (2d Dep't 2006); *Laugh Factory, Inc. v. Basciano*, 608 F.Supp.2d 549, 558 (S.D.N.Y.2009) (noting that the "clear and convincing" standard applies on summary judgement). "A party cannot claim reliance on a misrepresentation when he or she could have discovered the truth with

due diligence." *KNK Enters., Inc.*, 824 N.Y.S.2d at 307. While the issue of reasonable reliance is undoubtedly a fact-intensive one, in "rare circumstance[s]" summary judgment may be warranted. *Global Minerals & Metals Corp. v. Holme*, 35 A.D.3d 93, 824 N.Y.S.2d 210, 215 (1st Dep't 2006) (holding that reliance on alleged misrepresentations was unreasonable as a matter of law).

■■■ Plaintiff's fraud claim is premised on an alleged misrepresentation by Commerzbank in connection with the 2013 Transaction. As noted, the 2013 Transaction between Société Générale and Commerzbank closed on April 23, 2013. *See* Def.'s Stmt. ¶ 66. SCS learned of the 2013 Transaction two days later at a meeting between Commerzbank employees, Paul Burrows and Peter Thompson, and SCS's two shareholders, Paul Edwards and Adam Parr. *See id.* ¶ 100. At that meeting, Burrows told Edwards and Parr that the "transaction size was $150 million," *id.* ¶ 102, which he subsequently testified was a reference to the amount of credit exposure to Société Générale that Commerzbank was taking on the 2013 Transaction, *see* Irwin Decl. dated Sept. 8, 2015, Ex. 38 at 161–68.[19] Edwards and Parr testified, however, that they understood Burrows to mean that the face value of the securities that Société Générale acquired in the 2013 Transaction was $150 million, *see* Def.'s Stmt. ¶ 103, when the actual face value of those securities was $1.3 billion, *id.* ¶ 67. SCS subsequently settled its claims against Société Générale arising out of the 2013 Transaction for $675,000, *see id.* ¶ 122, which it contends it never would have done had it correctly understood the size of the 2013 Transaction.

---

**19.** Commerzbank's actual exposure to Société Générale was $120 million, *see* Def.'s Stmt. ¶ 72, but that discrepancy does not form the basis of the alleged fraud.

SCS contends that "industry practice is to describe transactions in terms of their notional [face value], not any other measure," suggesting that its reliance was reasonable for that reason. Pl.'s Opp. at 25. SCS points to no support for this proposition other than the declarations of its principals. But even assuming *arguendo* that this contention is correct, the evidence is overwhelming that plaintiff's reliance was not reasonable.

Indeed, plaintiff's 30(b)(6) witness, Paul Edwards, testified that he found the $150 million figure "surprising." Def.'s Stmt. ¶ 110. When asked if he had "any suspicions that maybe Commerzbank was trying to underplay the size of the deal," Edwards responded that "[w]e were concerned as to the possibility that it was." Irwin Decl. dated Sept. 8, 2015, Ex. 1 at 225:12–17. The undisputed record thus establishes that plaintiff was on notice that its purported understanding of what Burrows meant may very well have been incorrect. Yet, despite Edwards' surprise and despite the fact that Burrows did not specify whether he was referring to credit exposure or face value, plaintiff never asked what Burrows meant by the $150 million figure or otherwise sought confirmation from Commerzbank of its understanding. *See* Irwin Decl. dated Sept 8., 2015, Ex. 25 at 225:10–226:10. Moreover, during its settlement negotiations with Société Générale, SCS unsuccessfully requested disclosure from Société Générale of the size of the 2013 Transaction, Def.'s Stmt. ¶¶ 115–119, yet never mentioned that it believed the 2013 Transaction's face value was $150 million, *id.* ¶ 118. Rather, in settling with Société Générale, SCS took the "calculated risk" that Société Générale was "underpaying" it. *Id.* ¶ 121.

 "[W]hen the party to whom a misrepresentation is made has hints of its falsity, a heightened degree of diligence is required of it. [I]t cannot reasonably rely on such representations without making additional inquiry to determine their accuracy." *Global Minerals & Metals Corp.*, 824 N.Y.S.2d at 216 (citation omitted). Indeed, "[w]hen a party fails to make further inquiry ... it has willingly assumed the business risk that the facts may not be as represented." *Id.* That is precisely what occurred here. SCS points to no facts indicating that it exercised the "due diligence" required by New York law to show reasonable reliance under the circumstances. As such, SCS cannot demonstrate reasonable reliance as a matter of law and the Court grants Commerzbank summary judgment on plaintiff's fraud claim.[20]

For the foregoing reasons, the Court grants defendant summary judgment dismissing plaintiff's claims of unjust enrichment, misappropriation of trade secrets, and fraud, but denies defendant summary judgment on plaintiff's breach of contract claim. The parties are directed to contact the Court by no later than April 21, 2016 to schedule a date for trial. The Clerk of the Court is hereby directed to close document numbers 35 and 36 on the docket of this action.

SO ORDERED.

20. Commerzbank also asserts that SCS's fraud claim fails because plaintiff cannot show fraudulent intent. Because the fraud claim founders on the absence of reasonable reliance, the Court need not reach this alternative ground for dismissal.